| | |
|---|---|
| BAYLEY'S CAMPGROUND, INC, d/b/a BAYLEY'S CAMPING RESORT, *et al.*,<br><br>Plaintiff<br><br>v.<br><br>JANET MILLS, in her official capacity as the Governor of the State of Maine,<br><br>Defendant. | CIVIL ACTION NO.: 2:20-cv-00176-LEW |

## DEFENDANT'S OPPOSITION TO PLAINTIFFS'
## MOTION FOR PRELIMINARY INJUNCTION

The State of Maine, like the rest of the world, is confronting a public health emergency of a magnitude unseen in at least a century. COVID-19, a respiratory illness that has killed approximately 345,000 people worldwide, is here in Maine. The illness is caused by a virus that has never been seen before and is poorly understood. What is known, though, is that it spreads through personal contact and that persons often spread the virus before they even know they have it. Because there is no vaccine or effective pharmaceutical treatment for the virus, it is critical to control the virus's spread. This reduces the chances of individuals contracting the virus and ensures that sufficient medical resources will be available to care for those who do contract it. While Maine's health care system has proved capable of managing COVID-19 cases to date, a sudden influx of new cases could overwhelm the system. Maine has a population of just 1.3 million residents. Last summer there were 22.1 million non-resident visits, with over half of those visits coming from states where infection rates are much higher than in Maine. Recognizing the need to control the virus and protect our residents, Maine's Governor, through a carefully calibrated process and in close consultation with government officials and public health experts,

has issued a series of Executive Orders pursuant to her authority under state law. Many of these orders are intended to prevent members of the existing population from infecting each other. The order at issue here addresses the risk posed by a potential influx of millions of people. To be clear, the order does <u>not</u> ban travel into or from Maine. Rather, it simply imposes the reasonable requirement that upon arrival, persons (including returning Mainers) self-quarantine for 14 days before interacting with others in the community. If a person is asymptomatic after 14 days, it is unlikely that he or she carried in the virus, and the person can then engage in activities in Maine to the same extent, and subject to the same Executive Orders, as the rest of Maine's population.

The self-quarantine order does not implicate or violate the constitutional right-to-travel or any other constitutional provision. As the Supreme Court held long ago, states have broad latitude when confronting a public health emergency, and the normal constitutional analysis does not apply. Rather, an action taken in such a situation will be upheld unless it has no "real or substantial relation" to protecting the public health or is "beyond all question, a plain, palpable invasion of rights secured by the fundamental law." *Jacobson v. Massachusetts*, 197 U.S. 11, 31 (1905).

Federal courts across the country have applied the *Jacobson* standard to actions taken by states to control the COVID-19 virus, and the vast majority have found those actions to be constitutional. Maine's self-quarantine requirement easily passes this standard, and, even if the *Jacobson* standard did not apply, the self-quarantine requirement would nevertheless pass constitutional scrutiny. Plaintiffs are thus not likely to succeed on the merits, the "sine qua non" factor in deciding whether to issue a preliminary injunction. All the other relevant factors also support denying an injunction. Most notably, elimination of the self-quarantine requirement, at least at this time, would threaten the public health, and the plaintiffs' desire to recreate and visit

friends in other states without self-quarantining does not outweigh Maine's interest in protecting its population. Plaintiffs' motion should therefore be denied.[1]

## FACTUAL BACKGROUND

The 2019 Novel Coronavirus (COVID-19) is a respiratory illness caused by a coronavirus, known as SARS-CoV-2. Declaration of Nirav Dinesh Shah, M.D., J.D. ("Shah Decl.") ¶ 9. The history of the COVID-19 outbreak, its devastating impact, and the state, national, and international response is set forth in this Court's decision in *Calvary Chapel of Bangor v. Mills*, 2020 WL 2310913, at *1-4 (D. Me. May 9, 2020). *See also* Shah Decl. ¶¶ 10-12. Of note, as of 11:00 a.m. on May 25, 2020, there have been 2,074 confirmed cases in Maine, resulting in 78 deaths. Shah Decl. ¶ 12.

Amid this public health crisis, scientists in the United States and around the world are working to understand the COVID-19 virus, but much remains unknown. The virus spreads, among other ways, through respiratory droplets produced when an infected person coughs, sneezes, or talks and through close personal contact, such as touching or shaking hands. *Id.* ¶ 13. The virus has an incubation period of up to 14 days, and a person can be infected and spread the virus during that entire time period without noticing any symptoms. *Id.* ¶ 15. This "asymptomatic transmission" makes control of COVID-19 very difficult, because individuals may transmit the disease before knowing they have it. *Id.* ¶ 16.[2] It is clear that the COVID-19 virus is spreading very easily and sustainably between people. *Id.* ¶ 18. There is currently no vaccine or widespread

---

[1] The plaintiffs include two corporations that operate campgrounds in Maine and a corporation that operates a restaurant serving campground customers. Complaint, ¶¶ 44-45. They will be referred to as the "Campground Plaintiffs." The remaining plaintiffs are two individuals who reside in New Hampshire but would like to camp in Maine this summer and one individual who lives in Maine but would like to cross back and forth across the border for various reasons. They will be referred to as the "Individual Plaintiffs."

[2] According to a recent analysis by the United States Centers for Disease Control and Prevention, approximately 40% of all COVID-19 transmission can occur while individuals are asymptomatic and approximately 35% of all COVID-19 patients do not have symptoms at all. *Id.* ¶ 17.

treatment for COVID-19.  *Id.* ¶ 18.[3]  The most effective method of controlling the virus is to practice "physical distancing," i.e., keeping appropriate space between oneself and others.  *Id.* ¶ 22.

To prepare for and respond to COVID-19 in Maine and to implement measures to mitigate the spread of COVID-19, the Governor proclaimed a State of Civil Emergency To Protect Public Health on March 15, 2020.  *See Calvary Chapel*, 2020 WL 2310913, *2.[4]  Subsequently, the Governor issued a series of Executive Orders and took other measures intended to control the spread of the COVID-19 virus and protect Maine's health care system.[5]  The primary goal of the State's management of this pandemic has been to a) contain the spread of the deadly virus in order to protect Maine citizens from acute sickness and death, and b) prevent Maine's health care delivery system from being overwhelmed by an unrestrained pandemic.  Declaration of Derek P. Langhauser ("Langhauser Decl.") ¶ 7.  The concern for the health care system arose from the inadequate supply of personal protective equipment that first responders, nurses, doctors and other front-line health care workers need, as well as a limited number of ventilators and intensive care unit beds required to treat seriously infected patients.  *Id.*  The Executive Orders and other measures taken to fight the virus were implemented progressively and timed to the rate and location of infection case increases in the State, changes in federal and state public health guidance as the scientific understanding of the virus has developed, and the actions of neighboring states whose own case rates could, by means of travel therefrom, affect Maine's case rates.  *Id.* ¶ 9.

---

[3] One drug – remdesivir – may reduce the length of hospitalization for severely ill patients, but it does not appear to reduce mortality in a statistically significant manner.  *Id.*, ¶ 20.  Further, it has not yet received full FDA approval and is in very short supply.  *Id.*, ¶¶ 20-21.

[4] The Proclamation is available at https://www.maine.gov/governor/mills/sites/maine.gov.governor.mills/files/inline-files/Proclamation%20of%20State%20of%20Civil%20Emergency%20To%20Further%20Protect%20Public%20Health.pdf.

[5] The orders are available at https://www.maine.gov/governor/mills/official_documents.  To date, the Governor has issued more than 40 Executive Orders in response to the COVID-19 pandemic.

A description of some of the Executive Orders and other measures taken by the State to combat COVID-19 is contained in paragraphs 10 and 11 of the Langhauser Declaration, and, for the sake of brevity, the State will not recite them all here. There are, though, a few measures worth highlighting: 1) on March 18, the Governor ordered all restaurants and bars statewide to close to dine-in customers and prohibited all gatherings of more than ten people (Executive Order 14); 2) on March 24, the Governor ordered all non-essential businesses and operations to close (Executive Order 19); and 3) on March 31, the Governor ordered Mainers to stay at home except for certain specified purposes (Executive Order 28). *Id*. ¶ 10(d), (f), (h).

Between March 31 and April 3, 2020, COVID-19 cases in the State increased from 303 to 432. *Id*. ¶ 10(k). Further, a number of municipalities (particularly coastal communities and areas with tourist attractions) expressed concerns about an influx of day and weekend visitors, as well as seasonal residents who would expedite their plans to return to Maine in order to escape from parts of the country (for example, Massachusetts and New York), with much higher infection rates. *Id*. ¶ 12. [6] Broader concerns were also expressed about the rapidly approaching tourist season. Last summer, Maine, with a population of just 1.3 million citizens, had approximately 22.1 million non-resident visits, with approximately half of those coming from regional neighbors Massachusetts, Connecticut, and New York, states with higher COVID-19 infection rates than Maine. *Id*. ¶ 13.

Given these concerns and case-related information available as of April 3,[7] the Governor determined, as advised by the Maine Center for Disease Control and Prevention ("Maine CDC"),

---

[6] There were also concerns that work-from-home orders issued by other states would induce even more people to come to Maine and increase the risk of the spread of COVID-19, since they would still be able to maintain their employment while here in a more rural and less populated state. Langhauser Decl. ¶ 12.

[7] Other considerations that led to issuance of the Order were that 1) on March 28, 2020, due to extensive community transmission of COVID-19 in the states of New York, New Jersey and Connecticut, the United States Centers for Disease Control advised residents of those states to refrain from non-essential domestic travel for 14 days; 2) the President of the United States and his Coronavirus Task Force issued an advisory to limit travel between and among

that the State needed to limit the introduction of new infections, not just address the risk of infection in the existing population in Maine. *Id*. ¶ 14. The additional measures were necessary to slow the spread of the COVID-19 virus and lessen the strain on Maine's health care system. *Id*. ¶ 14(a). Accordingly, on April 3, 2020, the Governor issued Executive Order 34, "An Order Establishing Quarantine Restrictions on Travelers Arriving in Maine." *Id*. ¶ 10(k); ECF Doc. 3-6, PageID 69-72. Essentially, the Order requires all persons entering Maine (residents and non-residents alike) to immediately self-quarantine for 14 days, except for persons engaging in certain "essential services" as defined in Executive Order 19. *Id*.[8] A period of 14 days was selected because this is the average incubation period of the virus; so, if a person is not exhibiting symptoms after 14 days, it is less likely that the person is infected with the COVID-19 virus. Langhauser Decl. ¶ 16; Shah Decl. ¶ 29.

The Governor acts based on changing conditions and the best available information. Order 34 – the self-quarantine order – was set to expire on April 30, 2020, but it was extended to May 31, 2020, unless sooner amended, by Executive Order 49. *See* ECF Doc. 3-6, PageID 73-76.[9] Order 49 explained that the "timing, pace and scope of any easing of current restrictions" would be guided by "three primary metrics:" 1) "a downward trajectory of reported influenza-like illnesses and COVID-like syndromic cases;: 2) "a downward trajectory of documented cases and newly hospitalized patients;" and 3) "the capacity of Maine's hospital systems to treat all patients without crisis care and the ability of the State to engage in a robust testing program." *Id*. Conditions on the ground can change quickly. For example, on May 7, 2020, the Governor

certain states; and, 3) several states in the region began imposing their own quarantine and lodging restrictions in order to prevent the spread of COVID-19 from travel. *Id*., ¶ 13(b), (c), (d).
[8] Plaintiffs wrongly assert that Order 34 "ban[s] all travel from certain regions." PI Motion, at 2. Rather, the Order simply advises against persons coming to Maine from certain areas and "hot spots." Langhauser Decl., ¶ 17. People are free to come to Maine from <u>any</u> place, so long as they self-quarantine. The Order simply expresses the expectation that people will exercise some common sense.
[9] Order 49 also extended Orders 14, 19 and 28 to May 31. *Id*.

announced a partnership with IDEXX Laboratories, Inc. to purchase enough of the company's recently authorized COVID-19 testing kits to more than triple the State's testing capacity. Langhauser Decl. ¶ 11(b). Use of this testing may facilitate a safer reopening. *Id.* At present, though, the self-quarantine requirement for those entering Maine remains in effect, and, for the reasons to be discussed, it should not be enjoined. Shah Decl. ¶ 44 (while the State continues to evaluate ways in which the self-quarantine requirement could be eased or eliminated, the requirement is currently "the best way to adequately protect the public health while still ensuring that certain essential services and operations can continue").

## ARGUMENT

In considering whether to issue a preliminary injunction,

> trial courts must consider (1) the likelihood of success on the merits; (2) the potential for irreparable harm if the injunction is denied; (3) the balance of relevant impositions, i.e., the hardship to the nonmovant if enjoined as contrasted with the hardship to the movant if no injunction issues; and (4) the effect (if any) of the court's ruling on the public interest.

*Ross-Simons of Warwick, Inc. v. Baccarat, Inc*., 102 F.3d 12, 15 (1st Cir. 1996). "The party seeking the preliminary injunction bears the burden of establishing that these four factors weigh in its favor." *Esso Standard Oil Co. (Puerto Rico) v. Monroig-Zayas*, 445 F.3d 13, 18 (1st Cir. 2006). "The *sine qua non* of this four-part inquiry is likelihood of success on the merits: if the moving party cannot demonstrate that he is likely to succeed in his quest, the remaining factors become matters of idle curiosity." *New Comm Wireless Servs., Inc. v. SprintCom, Inc.*, 287 F.3d 1, 9 (1st Cir. 2002). Here, Plaintiffs cannot establish any of the factors.

I.  **Plaintiffs Are Not Likely to Succeed on the Merits Because the Self-Quarantine Requirement is Constitutional Under the Standard Set by the Supreme Court for State Action Taken to Curb a Public Health Threat.**

The Supreme Court has made clear that when a state is facing a public health emergency and enacts measures to protect its residents, the measures are afforded great deference and the usual constitutional analysis does not apply.  In *Jacobson v. Massachusetts*, 197 U.S. 11 (1905), a city had an outbreak of smallpox, and it enacted a regulation requiring that, under threat of criminal penalties, all inhabitants be vaccinated.  A person charged with violating the regulation challenged its constitutionality under the Fourteenth Amendment, arguing "that a compulsory vaccination law is unreasonable, arbitrary, and oppressive, and, therefore, hostile to the inherent right of every freeman to care for his own body and health in such way as to him seems best."  *Id*. at 26.

The Supreme Court rejected the challenge, stating that

> the liberty secured by the Constitution of the United States to every person within its jurisdiction does not import an absolute right in each person to be, at all times and in all circumstances, wholly freed from restraint.  There are manifold restraints to which every person is necessarily subject for the common good.  On any other basis organized society could not exist with safety to its members.

*Id*.  The Court further recognized that "[u]pon the principle of self-defense, of paramount necessity, a community has the right to protect itself against an epidemic of disease which threatens the safety of its members."  *Id.* at 27.  The Court held that a regulation intended to protect against such a threat would be struck down only if it has "no real or substantial relation" to its goal of protecting the public health or is "beyond all question, a plain, palpable invasion of rights secured by the fundamental law."  *Id*. at 31.  Applying this test, the Court upheld the compulsory vaccination law, *id*. at 39, a measure more intrusive than Maine's requirement that persons entering the state self-quarantine for 14 days.

Across the country, federal courts have affirmed that the *Jacobson* test applies to measures imposed by states to protect their residents from the COVID-19 virus. This very Court applied *Jacobson* when a church challenged the Governor's Executive Order limiting gatherings to no more than 10 people. *Calvary Chapel*, 2020 WL 2310913. The court recognized a state's right to protect residents from an epidemic and stated that "while such an epidemic in ongoing, the 'traditional tiers of constitutional scrutiny do not apply.'" *Id.* at *7 (quoting *Cassell v. Snyders*, 2020 WL 2112374, at *6 (N.D. Ill. May 3, 2020)). "During that temporary time and in those narrow contexts, *Jacobson* instructs that courts should only overturn state action when it lacks a 'real or substantial relation to the protection of the public health' or represents 'a plain, palpable invasion of rights secured by the fundamental law.'" *Id.* at *7 (quoting *Jacobson*, 197 U.S. at 31). Applying this standard, the court found that the church was unlikely to prevail on its challenge to the gathering restriction.

The United States District Court for the District of Oregon likewise applied *Jacobson* in a challenge to executive orders restricting the operation of businesses. *Save Our Oregon v. Brown*, 2020 WL 2542861 (D. Or. May 19, 2020). In ruling on plaintiffs' preliminary injunction motion, the court concluded that the "Plaintiffs' federal constitutional claims [were] unlikely to succeed on the merits." *Id.*, at *2. After discussing *Jacobson*, the Court stated that it was "inclined to side with the chorus of other federal courts in pointing to *Jacobson* and rejecting similar constitutional claims brought by Plaintiffs challenging similar COVID-19 restrictions in other states." *Id.* In *Amato v. Elicker*, 2020 WL 2542788 (D. Conn. May 19, 2020), plaintiffs similarly challenged various executive orders on constitutional grounds, including ones limiting the operation of bars and restaurants. The court recognized that under *Jacobson*, "states may 'institute extraordinary measures to protect public health.'" *Id.*, at *9. The court further stated that "while the power of

state governments during an epidemic is, of course, not limitless," "*Jacobson* requires that courts refrain from second-guessing state governments' responses unless there is 'no real or substantial relation' between the actions and the public health and safety or the action is 'beyond all question, a plain, palpable invasion of rights.'" *Id.*, at *10 (quoting *Jacobson*, 197 U.S. at 31). The court denied the plaintiffs' preliminary injunction motion. *Id.*, at *13.

Numerous other courts (including at least two Courts of Appeals) have taken this same approach. *See In re Rutledge*, 956 F.3d 1018, 1027–1032 (8th Cir. 2020) (applying *Jacobson* standard to directive requiring postponement of all elective and non-emergency surgical procedures); *In re Abbott*, 954 F.3d 772, 784 (5th Cir. 2020) ("The bottom line is this: when faced with a society-threatening epidemic, a state may implement emergency measures that curtail constitutional rights so long as the measures have at least some 'real or substantial relation' to the public health crisis and are not 'beyond all question, a plain, palpable invasion of rights secured by the fundamental law.'"); *Elim Romanian Pentecostal Church v. Pritzker*, 2020 WL 2468194, at *3 (N.D. Ill. May 13, 2020) ("[T]he COVID-19 pandemic qualifies as the type of public health crisis that *Jacobson* contemplated. That finding means that to have any likelihood of success on the merits plaintiffs must demonstrate either that the Order has no real or substantial relation to the public health crisis or that it is a plain, palpable invasion of their rights.");[10] *Antietam Battlefield KOA v. Hogan*, 2020 WL 2556496, at *7 (D. Md. May 20, 2020) ("But although there may be more than one reasonable way to respond to the COVID-19 outbreak, it is clear that the Governor's orders have at least a real and substantial relation to protecting public health."); *SH3 Health Consulting, LLC v. Page*, 2020 WL 2308444, at *1 (E.D. Mo. May 8, 2020) ("The Court's limited

---

[10] The plaintiffs in *Elim* appealed to the Seventh Circuit and moved for an injunction pending appeal. The court denied the motion, finding plaintiffs failed to show sufficient likelihood of success to warrant injunctive relief, and, citing *Jacobson*, noting that the challenged Executive Order "responds to an extraordinary public health emergency." *Elim Romanian Pentecostal Church v. Pritzker* 2020 WL 2517093, at *1 (7th Cir. May 16, 2020).

role of judicial review is not to assess the wisdom of the Orders, but to determine whether the Orders violate the law. . . . [T]he Court finds that they do not violate the Constitution because they have a real and substantial relation to the goal of stemming the tide of the public-health pandemic, and they are not 'beyond all question, a plain, palpable invasion of rights secured by the fundamental law.'"); *Cross Culture Christian Ctr. v. Newsom*, 2020 WL 2121111, at *5 (E.D. Cal. May 5, 2020) ("But during public health crises, new considerations come to bear, and government officials must ask whether even fundamental rights must give way to a deeper need to control the spread of infectious disease and protect the lives of society's most vulnerable. Under these rare conditions, the judiciary must afford more deference to officials' informed efforts to advance public health—even when those measures encroach on otherwise protected conduct; even when thoughtful minds could disagree about how to best balance the scales."); *Gish v. Newsom*, 2020 WL 1979970, at *5 (C.D. Cal. Apr. 23, 2020) ("In other words, during an emergency, traditional constitutional scrutiny does not apply."); *Berean Baptist Church v. Cooper*, 2020 WL 2514313, at *6 (E.D.N.C. May 16, 2020) (stating that "*Jacobson* remains the lodestar in striking the balance between constitutional rights and public safety" but holding that order at issue did not meet the standard); *Geller v. De Blasio*, 2020 WL 2520711, at *3 (S.D.N.Y. May 18, 2020); *McGhee v. City of Flagstaff*, 2020 WL 2308479, at *5 (D. Ariz. May 8, 2020); *Spell v. Edwards*, 2020 WL 2509078, at *3-4 (M.D. La. May 15, 2020).[11]

In addition, the Supreme Court has recognized the broad powers of states when it comes to quarantines. In *Compagnie Francaise de Navigation a Vapeur v. Bd. of Health of State of Louisiana*, 186 U.S. 380 (1902), a quarantine order that prohibited healthy passengers on a ship

---

[11] In *First Baptist Church v. Kelly*, 2020 WL 1910021 (D. Kan. Apr. 18, 2020), the court held that *Jacobson* did "not provide the best framework" for evaluating an executive order restricting gatherings, but the court said that this was "based on the relatively unique circumstances" of the case at bar. *Id.* at *6. The unique circumstances were apparently the court's conclusion that the restriction was not facially neutral but instead singled out religious assembly.

from disembarking and entering communities that were experiencing disease outbreaks was challenged on Commerce Clause and Fourteenth Amendment Due Process grounds. Apparently, the quarantine's purpose was not to stop the introduction of disease (which was already prevalent) but, presumably, to limit its spread by reducing the number of people who could potentially become infected.[12] Maine seeks to do the same here: limit the spread of a prevalent disease by requiring individuals entering the state to quarantine for a short period of time linked to the incubation period of COVID-19. In rejecting the challenge in *Compagnie*, the Supreme Court stated:

> That from an early day the power of the states to enact and enforce quarantine laws for the safety and the protection of the health of their inhabitants has been recognized by Congress, is beyond question. That until Congress has exercised its power on the subject, such state quarantine laws and state laws for the purpose of preventing, eradicating, or controlling the spread of contagious or infectious diseases, are not repugnant to the Constitution of the United States, although their operation affects interstate or foreign commerce, is not an open question.

*Id*. at 387.

Given the broad deference given to state measures taken during a public health crisis, the self-quarantine requirement easily passes muster. First, it bears a "real or substantial relation" to the COVID-19 pandemic. There can be no dispute that the virus spreads through personal contact. Measures taken to limit the extent to which infected persons come into contact with others necessarily bear a real or substantial relation to the pandemic. Nor can there be any dispute that massive numbers of people come into Maine, and many of them are coming from areas with high rates of infection. The self-quarantine requirement ensures that those persons will not interact in the community until it can be demonstrated that they are likely free of the COVID-19 virus.

---

[12] The lower court described the people entering the area as "added fuel" and the purpose of the quarantine thusly: "'The object in view was to keep down, as far as possible, the number of persons to be brought within danger of contagion or infection, and by means of this reduction to accomplish the subsidence and suppression of the disease and the spread of the same.'" *Compagnie Francaise*, 186 U.S. at 385-86.

Beyond limiting the spread of the virus, it reduces the possibility that Maine's health care system will suddenly be inundated with a flood of new cases.

The plaintiffs' arguments that the self-quarantine requirement is not sufficiently tailored to reducing the threat of the virus fail both as a matter of law and a matter of fact. Under *Jacobson*, the test is not strict scrutiny and a perfect fit is not necessary. Even so, the self-quarantine requirement is narrowly tailored to advancing the State's interest in controlling the spread of COVID-19 and protecting Maine's health care system. Plaintiffs assert that the quarantine restrictions sweep too broadly, but the options they propose are not reasonable alternatives. Barring entry of only those persons exhibiting symptoms would not be effective because a person can be infected with the virus (and thus able to infect others) for up to 14 days before experiencing symptoms. Shah Decl. ¶ 38. Certain symptoms of COVID-19 also may indicate a different condition. *Id*. ¶ 40. Screening out only people who have had "close contact" with an infected person is "not scientifically sound" because infected individuals frequently exhibit no symptoms, so people can easily be exposed without knowing it. *Id.* ¶ 39. Testing individuals for the presence of the virus currently is not a feasible alternative because there are not enough test kits and there is still scientific uncertainty about the accuracy of antibody-based tests. *Id*. ¶ 41.[13] Allowing persons to bypass self-quarantine if they can document having had, and recovered from, COVID-19 is not presently viable because there continues to be significant scientific uncertainty about whether individuals who have previously been infected with the virus develop sufficient immunity to prevent them from transmitting it to others. *Id*. ¶ 42.[14]

---

[13] As the supply of test kits increases and better information become available regarding accuracy, testing may become a substitute for, or a supplement to, self-quarantine. *Id*.

[14] Allowing a person to self-quarantine in his home state and then come to Maine, as plaintiffs propose, is problematic for at least two reasons. First, there would be concerns about the reliability of a person's representation that he self-quarantined for 14 days before coming here, especially from persons who travelled some distance to reach Maine and had to use restrooms, get food and access lodging along the way. Langhauser Decl. ¶ 22. Second, while to some extent the self-quarantine requirement depends on voluntary compliance, it is easier to verify a person's claim that he self-

Some of plaintiffs' criticisms of the self-quarantine requirement are based on their fundamental misunderstanding of its purpose. It is not to stop the COVID-19 virus from entering Maine. As plaintiffs correctly point, PI Motion, 11-12, the virus is already here. Rather, its purpose is to reduce additional introductions of the virus into Maine, limit new avenues of transmission, and slow the overall spread of the disease. Shah Decl. ¶¶ 30, 33. It also helps prevent an undue strain on Maine's health care system. *Id*. ¶ 30. Maine had 22.1 million out-of-state visits last summer with a health care system designed for 1.3 million. *Id*. ¶¶ 35-36. Maine has only 391 critical care hospital beds, 165 of which are currently available.[15] *Id*. ¶ 36. The self-quarantine requirement reduces the risk that a person who enters the state, whether a Maine resident or not, could potentially (and unwittingly) transmit COVID-19 to others. *Id*. ¶ 37. Risk is minimized by ensuring that the vast majority of persons who enter the state[16] do not interact in the community until it is more certain that they were not carrying the COVID-19 virus at the time of their arrival. *Id*. Self-quarantine both controls the spread of the virus and reduces the possibility that Maine's health care system will be over-taxed by a sudden flood of new cases. *Id*.[17]

---

quarantined in Maine than to verify a person's claim that he self-quarantined in his home state. *Id*. For example, if an out-of-state resident falsely claimed to have self-quarantined in Maine upon arrival, State officials could follow up by asking the person for the location where he allegedly self-quarantined. *Id*. If a person claimed to have self-quarantined at his home in another state, however, it would be all but impossible to verify that claim. *Id*.

[15] Maine has a total of 318 conventional ventilators, 242 of which are currently unused. Shah Decl. ¶ 36. Maine has an additional 439 breathing machines that may have otherwise been used in an operating room but could be repurposed to provide ventilation to COVID-19 patients. *Id*.

[16] The quarantine requirement has an exception for people coming into Maine to work at essential businesses and operations. *See* PageID 70. It was determined, though, that the risk from such people was relatively small. On the other hand, the risk from the millions of people who, in the absence of a quarantine rule, would enter the state for recreational purposes, to escape high-infection areas, or to travel to seasonal homes is significantly larger. Shah Decl., ¶ 34; Langhauser Decl., ¶ 20. Further, requiring essential workers to self-quarantine would interfere with the delivery of essential services, including, perhaps most notably, health care services. It also would have prevented out-of-state power line workers from helping to restore service after a recent late spring snowstorm. Further, essential workers will generally be supervised by their employers and their activities in the state will be more constrained than those of individuals coming here for recreational or other non-work-related reasons.

[17] It may or may not make sense to require plaintiffs' hypothetical "accidental tourist" who takes a wrong turn and briefly drives out of, and immediately back into, Maine to self-quarantine. However, as a matter of public health policy, it is impossible to craft a rule that can account for every unique situation that might arise. Shah Decl. ¶ 43. The goal was to develop a rule that would account for the vast majority of risk from travel into the state: the influx of risk from spring and summer visitors or other persons coming here from areas with higher infection rates or for

Nor does the self-quarantine requirement constitute a "plain, palpable invasion" of any constitutional right. As will be discussed below, the requirement does not implicate either the right-to-travel or principles of due process, much less is it an obvious violation of those doctrines. The requirement does not prohibit persons from traveling to or from Maine. It simply requires that those entering the state self-quarantine for two weeks at a place of their own choosing. Far from being a "plain" or "palpable" violation of the Constitution, the requirement is a sensible, common-sense measure intended to protect the public from a deadly virus and ensure the stability of Maine's health care system.[18]

## II. Plaintiffs Are Not Likely to Succeed on the Merits Even Under a Traditional Analysis Because the Self-Quarantine Requirement Violates Neither the Right-to-Travel Nor the Due Process Clause.

Even if the *Jacobson* standard did not apply, the self-quarantine requirement does not implicate the constitutional right to interstate travel. Although the exact underpinning of the right to travel is disputed,[19] the Supreme Court has explained that there are three components of the right to travel:

> It protects the right of a citizen of one State to enter and to leave another State, the right to be treated as a welcome visitor rather than an unfriendly alien when

---

recreational and tourism purposes. *Id*.; Langhauser Decl., ¶ 20. The risk posed by such an influx is greater by orders of magnitude than that posed by hypothetical directionally challenged motorists.

[18] Plaintiffs' reliance on *Roberts v. Neace*, 2020 WL 2115358 (E.D. Ky. May 4, 2020) is misplaced. There, Kentucky's Governor issued orders banning residents from leaving the state and requiring residents and non-residents entering the state to self-quarantine for 14 days. *Id*., at *1-2. First, Kentucky had in fact established an interstate travel ban— Maine has not. Second, the court did not so much as mention *Jacobson* (or any of many cases applying *Jacobson* to the COVID-19 pandemic) or otherwise acknowledge the different analysis that applies to measures addressing a public health emergency. Third, there is nothing in the opinion suggesting that Kentucky was facing a massive influx of out-of-state visitors, and the court instead fixated on a few hypothetical effects, such as a person walking across the border and immediately returning. *Id*. at *5. Fourth, the court concluded that to enforce the quarantine, check points would have to be established at the border resulting in "[m]assive traffic jams," and the state would need to set up "[q]uarantine facilities" to "accommodate the hundreds, if not thousands, of people who would have to be quarantined." *Id*. Maine, however, is expecting visitors to comply with the quarantine requirement at an appropriate place of their own choosing.

[19] S*ee United States v. Guest*, 383 U.S. 745, 758 (1966) (the right to travel "finds no explicit mention in the Constitution"); *Attorney Gen. v. Soto-Lopez*, 476 U.S. 898, 902-03 (1986) (identifying and describing possible textual sources in the Constitution for the right to travel).

> temporarily present in the second State, and, for those travelers who elect to become permanent residents, the right to be treated like other citizens of that State.

*Saenz v. Roe*, 526 U.S. 489, 500 (1999).  Plaintiffs do not commit to what particular component of the right to travel they are claiming the state has violated, PI Motion at 8-13, but none of these components is implicated by the self-quarantine requirement.

The first component protects "the right to go from one place to another, including the right to cross state borders while en route."  *Id.* at 500.  For example, a California statute criminalizing the entry of indigent persons into the state violated the fundamental right to travel.  *Edwards v. California*, 314 U.S. 160, 168 (1941).  Similarly, a Nevada statute that imposed a "tax upon the passenger for the privilege of leaving the State, or passing through it by the ordinary mode of passenger travel"[20] was found to violate the constitutional right to travel.  *Crandall v. Nevada*, 73 U.S. 35, 40 (1867).  On the other hand, a statute that conditioned welfare benefits on a full year of residency in California did not implicate the first component of the right to travel because the statute did not create a barrier or obstacle to entry into the state.  *Saenz*, 526 U.S. at 501.  Here, the quarantine requirement imposes no barrier or obstacle to entry to or departure from the State like those the Supreme Court has found unlawful.  Individuals are free to enter and leave Maine; it is only <u>after</u> they are here that they must self-quarantine before further roaming about the state.  *See Bray v. Alexandria Women's Health Clinic*, 506 U.S. 263, 277 (1993) (explaining a purely intrastate restriction on movement does not implicate the right of interstate travel).

Nor are the second or third components of the right to travel implicated in this case.  The second component, derived from the Privileges and Immunities Clause, bars "'discrimination against citizens of other States where there is no substantial reason for the discrimination beyond

---

[20] Plaintiffs have not asserted that they are attempting solely to cross Maine on their way to another destination.

the mere fact that they are citizens of other States.'"[21] *Saenz*, 526 U.S. at 502 (quoting *Toomer v. Witsell*, 334 U.S. 385, 396 (1948)). The self-quarantine requirement does not discriminate between Maine residents and out-of-state residents; <u>all</u> individuals who enter the State must comply with the quarantine requirements. The third component, which prevents states from denying a "newly arrived citizen . . . the same privileges and immunities enjoyed by other citizens of the same State," *Saenz*, 520 U.S. at 502, is not infringed because none of the plaintiffs alleges an intent to change his or her residency. And, again, the quarantine requirement does not distinguish between residents and non-residents – a Maine resident returning to the state must self-quarantine to the same extent as a resident of another state.[22]

Even if the quarantine requirement did implicate the right-to-travel, it would survive strict scrutiny. Protecting Maine's population from the further spread of COVID-19 and preventing Maine's health care system from being overwhelmed are, without a doubt, compelling state interests. *See Ware v. Valley Stream High Sch. Dist.*, 550 N.E.2d 420, 429 (N.Y. 1989) (controlling AIDS epidemic was compelling state interest). As is discussed above, the quarantine requirement

---

[21] The Privileges and Immunities Clause applies only to protect non-residents from discrimination; the clause is not implicated when residents challenge their own state's law. *See Hawai'i Boating Ass'n v. Water Transp. Facilities Div.*, 651 F.2d 661, 666 (9th Cir. 1991).

[22] Citing *Attorney General v. Soto-Lopez*, 476 U.S. 898, 903 (1986), plaintiffs argue that the right to travel is implicated because they have been deterred from traveling. For two reasons, this argument fails. First, *Soto-Lopez* predates *Saenz*, which clarified the three components of the right to travel. Those three components have guided subsequent right to travel cases. *See, e.g.*, *Connelly v. Steel Valley School Dist.*, 706 F.3d 209, 213-214 (3d Cir. 2013); *Matsuo v. United States*, 586 F.3d 1180, 1183-84 (9th Cir. 2009); *United States v. Stevens*, 578 F. Supp.2d 172, 185 (D. Me. 2008). Moreover, the cases the *Soto-Lopez* Court cited in support of the deterrence theory are *Crandall*, 73 U.S. at 35, where the state taxed departure from and travel through a state, and *Shapiro v. Thompson*, 394 U.S. 618 (1969), where the state conditioned welfare benefits on length of residency. These two cases fall squarely within the three-component framework of *Saenz*, and *Soto-Lopez* therefore should not be read as creating a fourth component based on "actual deterrence."

Second, plaintiffs' argument proves too much. Under their theory, <u>any</u> law that deterred or dissuaded a person from traveling to another state would implicate the right to travel. For example, Ms. Humiston could take umbrage with Maine's sales tax law, *see* 36 M.R.S. § 1811 (imposing 5% sales tax on sales of tangible personal property), because it deters her from traveling here from New Hampshire, where there is no sales tax. It cannot be the case, though, that the sales tax law implicates the right to travel simply because it might actually deter some people from coming here.

is narrowly tailored to that advancing those interests, and all of the alternatives proposed by plaintiffs are unworkable or ineffective at achieving the State's goals.

Plaintiffs' claim that the quarantine restrictions violate due process is equally flawed. PI Motion at 14-17. First, it appears that only the Individual Plaintiffs are making this argument, and not the Campground Plaintiffs (which, apparently, are currently operating). Second, the plaintiffs do not commit to whether they are claiming the quarantine requirement violates substantive due process or procedural due process. Instead, they present a moving target based on quotations of broad legal principles without engaging in any real analysis. The State and the Court are thus left to guess at the basis for the Individual Plaintiffs' due process claims.

For example, plaintiffs seem to claim that they have been denied due process because the quarantine requirements exceed the State's police power. PI Motion at 15-16. As explained above, this argument is answered by *Jacobson* and its progeny, which make clear that states have broad powers to protect the public amidst a health crisis. Plaintiffs also seem to claim they have been denied procedural due process because there is insufficient guidance on what it means to self-quarantine. PI Motion at 16. It is difficult to understand what about self-quarantining for fourteen days the plaintiffs do not understand. And, ironically, plaintiffs themselves attached to their filing the Maine CDC guidance on self-quarantine (ECF Doc.3-6, PageID42-63), belying their own argument. Plaintiffs argue that they were not allowed to provide pre-adoption input or comment on the guidance under the Maine Administrative Procedures Act, PI Motion at 16, but the Governor is not an "agency" for purposes of that Act. 5 M.R.S. § 8002(2). And, in any event, the emergency powers provided by statute expressly permit the Governor to suspend the usual procedures "for the conduct of state business" if "strict compliance . . . would hinder or delay any necessary action in coping with the emergency." 37-B M.R.S. § 742(1)(C)(1). Plaintiffs glaringly ignore the rapid

onset and spread of COVID-19 and the urgent need to act quickly to protect Maine's population. *See Friends of Danny DeVito v Wolf*, 2020 WL 1847100, at *19 (Pa. Apr. 13, 2020); *see also Morrissey v. Brewer*, 408 U.S. 471, 481 (1972 ("[D]ue process is flexible and calls for such procedural protections as the particular situation demands.").

## III. Even If Plaintiffs Had Established a Likelihood of Success, the Remaining Factors Support Denying an Injunction.

The plaintiffs cannot establish irreparable harm, that the balance of hardships tips in their favor, or that the public interest warrants an injunction. As an initial matter, although the State has not yet moved to dismiss claims brought by the Campground Plaintiffs, those plaintiffs do not have standing to claim a right to travel and any harm they allege should thus not be considered in ruling on the preliminary injunction motion. The campgrounds obviously do not "travel," so it is impossible to see how they could have any right to travel, and plaintiffs cite no case supporting such a notion. To the contrary, the right to travel is a "<u>personal</u> right, guaranteed by the Constitution to us all." *Saenz*, 520 U.S. at 498 (1999) (emphasis added, internal quotation marks omitted); *see also Paul v. Virginia*, 75 U.S. 168, 178 (1868) (noting that corporations have never been considered citizens within the meaning of the Privileges and Immunities Clause). Moreover, the Campground Plaintiffs do not have standing to assert the rights of their customers. Generally, litigants are barred "from asserting the rights or legal interests of others in order to obtain relief from injury to themselves." *Warth v. Seldin*, 422 U.S. 490, 509 (1975). There are "limited exceptions" to this prohibition, but "three important criteria" must be satisfied:

> The litigant must have suffered an "injury in fact," thus giving him or her a "sufficiently concrete interest" in the outcome of the issue in dispute, the litigant must have a close relation to the third party, and there must exist some hindrance to the third party's ability to protect his or her own interests

*Powers v. Ohio*, 499 U.S. 400, 410-11 (1991) (citations omitted); *see also Eulitt v. Maine, Dept. of Educ.*, 386 F.3d 344, 351 (1st Cir. 2004). Here, there is no hindrance to the campgrounds' customers asserting their own interests. Indeed, two plaintiffs (Curtis Bonnell and Dolores Humiston) are, in fact, campground customers bringing claims in their own right.

Given that the Campground Plaintiffs do not have standing, the remaining factors weigh against an injunction as measured against the impact on the Individual Plaintiffs. One plaintiff – James Boisvert – lives in Maine and wants to freely go in and out of the state "to recreate, associate with friends, visit businesses, and simply take trips through New Hampshire for a variety of purposes." Complaint, ¶ 52. Curtis Bonnell and Dolores Humiston live in New Hampshire and would like to camp in Maine on weekends. Bonnell Decl., ¶¶ 3-4; Humiston Decl., ¶ 3-4. It is impossible to see how any of these plaintiffs would suffer irreparable harm if, like so many others, they were required to temporarily put their summer plans on hold. And, even if this did constitute irreparable harm, it must be weighed against the balance of the hardships and the public interest. Here, Maine, like the rest of the world, is facing a virtually unprecedented public health emergency:

> The State is managing an extraordinary array of issues, and it has responded to the challenges raised by COVID-19 by establishing uniform standards and restrictions that are based on evolving scientific evidence. Governor Mills has laid out a path for organizations to seek to ease restrictions. Upsetting the careful balance being drawn by Maine's Governor at this time would have an adverse effect on the public interest.

*Calvary Chapel*, 2020 WL 2310913, *10. The plaintiffs should not be permitted to interfere with the careful, medically based approach taken by Maine's Governor, and their motion for a preliminary injunction should be denied.

Dated: May 25, 2020

AARON M. FREY

Attorney General

/s/ Christopher C. Taub
Christopher C. Taub, Dep. Atty. Gen.
Christopher.C.Taub@maine.gov
Kimberly Patwardhan, Asst. Atty. Gen.
Kimberly.Patwardhan @maine.gov
Six State House Station
Augusta, Maine  04333-0006
Tel.  (207) 626-8800
Fax (207) 287-3145

## CERTIFICATE OF SERVICE

I hereby certify that on this, the 25th day of May, 2020, I electronically filed the above

document with the Clerk of Court using the CM/ECF system which will send notification of such

filing to the following:

GENE R. LIBBY
glibby@lokllc.com

KEITH P. RICHARD
krichard@lokllc.com

TYLER J. SMITH
tsmith@lokllc.com

/s/ Christopher C. Taub
CHRISTOPHER C. TAUB
Deputy Attorney General
Six State House Station
Augusta, Maine  04333-0006
Tel.  (207) 626-8800
Fax (207) 287-3145