## UNITED STATES DISTRICT COURT
## FOR THEDISTRICT OF MAINE

| | |
|---|---|
| BAYLEY'S CAMPGROUND, INC, d/b/a BAYLEY'S CAMPING RESORT, *et al*.,, <br><br> Plaintiffs <br><br> v. <br><br> JANET MILLS, in her official capacity as the Governor of the State of Maine, <br><br> Defendant. | CIVIL ACTION NO.: 2:20-cv-00176-LEW |

## <u>DECLARATION OF DEREK P. LANGHAUSER</u>

I, Derek P. Langhauser, hereby declare as follows:

1.      I am Derek P. Langhauser, an attorney authorized to practice law in Maine since 1987.  I am currently Chief Legal Counsel to Governor Janet T. Mills.  I am a principal advisor to the Governor on the State's emergency response and her use of emergency powers in dealing with COVID-19.  My professional experience includes serving as Chief Legal Counsel to Governor John R. McKernan, Jr. during Maine's state of emergency in the summer of 1991 resulting from a government shutdown.

2.      Since the end of February 2020, my COVID-19-related duties have included assessing communications from the White House, monitoring the executive orders of governors of other states, and coordinating regional issues with the legal counsels to the governors of New Hampshire and Vermont.  My duties have also included identifying, developing, prioritizing, and managing a wide variety of pandemic-related operational, governmental and legal issues arising from COVID-19 across Maine.

3.      Deputy Legal Counsel Linda M. Pistner and I are the principal authors of the Governor's emergency executive orders, including Executive Order 34 FY 19/20 cited in Plaintiff's Complaint.

4.      Generally speaking, the purpose of these Orders has been to exercise the Governor's expressly delegated authority to take actions that protect the public health of the people, support the economic needs of citizens and entities who have been affected by COVID-19, and facilitate the operational needs of state government.  The challenge has been to prevent the spread of the virus while still allowing certain essential economic, medical, governmental and social functions to continue as safely as possible.  The Orders have been based on consultation with public health experts and the best available medical information at that time.  The COVID-19 emergency is not like an ice storm or a flood where there are emergency plans in place and the resulting damage is visible at any point in time.  The virus is new, and much is still not known about it and how it spreads, and so we have taken a one-step-at-a-time approach, albeit at a highly accelerated pace.

5.      The Maine Center for Disease Control and Prevention (Maine CDC) is the lead state agency guiding the State's public health-based responses to this dangerous and deadly pandemic.  Starting in December of 2019, Maine CDC began monitoring the outbreak of the novel Coronavirus, COVID-19, in Wuhan, China, and dedicated 30 staff members to focus on preparing for cases in Maine.  On March 2, 2020, Governor Mills convened a Coronavirus Response Team headed by Maine CDC Director Dr. Nirav Shah.

6.      The Maine Department of Economic and Community Development (DECD) is the lead state agency guiding the State's response to the economic and social impacts of this pandemic.  Generally speaking, DECD has organized its approach to COVID-19 impacts

by identifying approximately 70 categories of the tens of thousands of Maine's business, social, and other entities whose operations have been seriously affected by COVID-19. Restaurants and campgrounds are two such businesses.  DECD continues to manage and respond to an extraordinary array of issues, challenges, and questions that this unprecedented pandemic very quickly has created.

7.      The primary goal of the State's management of this pandemic has been a) to contain the spread of the deadly virus in order to protect Maine citizens from acute sickness and death, and b) to protect Maine's health care delivery system from being overwhelmed by an unrestrained pandemic.  The concern for the health care system arose from the inadequate supply of personal protective equipment (PPE) that first responders, nurses, doctors and other front-line health care workers need, as well as a limited number of ventilators and intensive care unit beds required to treat seriously infected patients.

8.      From the very beginning of the pandemic, the United States Center for Disease Control and Prevention (USCDC) and Maine CDC have consistently advised that the most effective way to limit the spread of the virus is to distance members of society from one another by limiting their in-person contact.

9.      In Maine, these distancing measures, broadly defined, have been implemented by a series of different methods and progressive steps.  The timing of the implementation of these measures has been tied to the rate and location of infection case increases in the State, changes in federal and state public health guidance as the scientific understanding of the virus has developed, and the actions of neighboring states whose own case rates could, by means of travel therefrom, affect Maine's case rates.

10.   A brief chronological summary of the progressive yet rapid measures that the State has taken to contain the spread of the virus by containing the movement and gathering of people is, to the best of my recollection, as follows:

a.   On March 12, when Maine recorded its first positive presumptive case, the Governor 1) suspended all non-essential out-of-state work travel by State employees; and 2) recommended, on the advice of Maine CDC, that non-essential large, indoor gatherings of 250 attendees or more be postponed in order to delay a potential coronavirus outbreak and substantially reduce its spread.

b.   On March 15, the Governor declared a Civil State of Emergency and recommended 1) ending classroom instruction in all public schools as soon as reasonably practical; 2) postponing, with consultation between the patient and provider, all non-urgent medical procedures, elective surgeries, and appointments at hospitals and health care providers across the state until further notice; 3) restricting visitors and all non-essential health care personnel to long-term care facilities except for certain compassionate care situations such as end of life until further notice; 4) postponing all events with 50 or more people until further notice; and 5) postponing all gatherings of more than 10 that include individuals who are at higher risk for severe illness, such as seniors, until further notice.

c.   On March 16, the Governor called for the statewide cancellation of Saint Patrick's Day events to prevent the gathering of large crowds and further encourage social distancing measures.  The Maine Legislature adjourned on March 17, one month early, as its own protective caution against gathering.

d.      By March 18, Maine had 43 COVID-19 cases.  The same day, the Governor issued Executive Order 14 FY 19/20 mandating that all restaurants and bars statewide close to dine-in customers for an initial period of 14 days.  Take-out, delivery, and drive-through options could continue.  In the same Order the Governor followed USCDC's then guidance on gatherings and prohibited all gatherings of more than 10 people.  Those gatherings included, for example: community, civic, public,  and leisure events; social clubs; sporting events with spectators; concerts, conventions, fundraisers, parades, fairs, and festivals; and any similar event or activity in a venue such as an auditorium, stadium, arena, large conference room, meeting hall, theatre, or private club.  In addition, the Governor strongly urged non-essential public-facing businesses, such as gyms, hair salons, theatres, casinos, and shopping malls, to close their doors for the next two weeks to minimize public gatherings.

e.      On March 19, the Governor continued to press the Federal government to provide more PPE and testing supplies to the State.  In a letter to Vice President Mike Pence and U.S. Secretary of Health and Human Services Alex Azar, the Governor requested that the Federal government expedite the release of PPE from the Strategic National Stockpile and pushed for "a steady and reliable supply" of testing materials as the outbreak intensified.

f.      On March 24, there were 118 COVID-19 cases in Maine.  The same day, the Governor issued Executive Order 19 FY 19/20 that: 1) directed all non-essential businesses and operations in Maine to close their physical locations that were public facing, meaning those that allowed customer, vendor or other in-person contact; 2) strongly urged all large, essential, public-facing businesses to immediately

employ strategies to reduce congestion in their stores, including limiting the number of customers in the store at any one time and enhancing curbside pick-up and delivery services; and 3) directed businesses that could do so to have their employees work from home and, if not, employ appropriate measures to ensure social distancing in the workplace.

g.    On March 26, the Governor approved a recommendation by the Department of Agriculture, Conservation and Forestry's Bureau of Parks and Lands to close the following coastal state parks because they were attracting large public gatherings: Reid State Park, Popham Beach State Park, Fort Popham, Fort Baldwin, Kettle Cove State Park, Two Lights State Park, Crescent Beach State Park, Scarborough Beach State Park, Ferry Beach State Park, and Mackworth Island.

h.    Between March 27 and March 31, COVID-19 cases in the State increased sharply, from 168 to 303. On March 31, the Governor therefore issued Executive Order 28 FY 19/20 that: 1) directed people living in Maine to stay at home at all times unless for an essential job or an essential personal reason, such as obtaining food, medicine, health care, or other necessary purposes; 2) closed public K-12 school in-person learning for the remainder of the school year; 3) restricted the use of public transportation; and 4) imposed in-store customer limits and related safety measures on public facing stores.

i.    At about this same time, concerns for distancing informed the decisions of a variety of public officials to, for example: 1) transition about 85% of the State's approximately 13,000 employees to work from home; 2) substantially limit in-person proceedings in the State courts; and 3) stop in-person learning and

residential dorm occupancy at the seven Community Colleges, the seven Universities of Maine, Maine Maritime Academy, as well as private schools and colleges.

j.   On April 1, the Governor requested that the President of the United States declare Maine a Presidential Major Disaster in light of the significant impact of COVID-19 on the State, which request was granted on April 4.

k.   Between March 31 and April 3, COVID-19 cases in the State increased sharply from 303 to 432.  On April 3, the Governor therefore issued Executive Order 34 FY 19/20, "An Order Establishing Quarantine Restrictions on Travelers Arriving in Maine."  This Order is the subject of this litigation and will be discussed further below.  Essentially, though, the Order requires all persons entering Maine, residents and non-residents alike, to immediately self-quarantine for 14 days, except for persons engaging in certain "essential services" as defined in Executive Order 19 FY 19/20.  The Order also directed lodging operations (including campgrounds) to close, except to the extent the operations were providing housing in certain narrowly defined circumstances.

l.   Between April 3 and April 7, COVID-19 cases increased from 432 to 519.  In response, the Governor directed the Maine National Guard and the Maine Emergency Management Agency to work with Maine's health care systems to prepare two alternative care sites in Portland and Bangor as part of the State's preparations to bolster Maine health system capacity.

m.   Between April 7 and April 10, COVID-19 cases in Maine increased from 519 to 586.  The Governor therefore issued Executive Order 39 FY 19/20 moving Maine's

primary election from Tuesday, June 9, 2020, to Tuesday, July 14, 2020, to: 1) allow for more time to arrange for necessary public health protections needed for in-person voting; and 2) permit more use of absentee ballots to avoid large in-person gatherings at the polls.

n.   Between April 10 and April 14, COVID-19 cases increased from 586 to 734.   The Governor therefore signed on April 14 a renewed proclamation extending Maine's state of civil emergency for another thirty days.

o.   On April 16, the Governor issued Executive Order 40 FY 19/20 limiting evictions during the state of emergency in order to support the purposes of the Stay-at-Home Order (Executive Order 28 FY 19/20) and to protect homeless shelters from having new, and potentially infected, persons seeking to use the shelters' vulnerable, open and co-habited resources.

11.   By April 29, Maine CDC advised that, as a likely consequence of all of the above measures, Maine appeared to have started to "flatten the curve" (i.e. reduced the rate of new infections.   Maine had also received increased PPE and related equipment, so the Governor was advised that she could consider initiating a phased-in reopening plan to reduce the economic pressures.   To that end:

a.   On April 29, the Governor signed Executive Order 49 FY 19/20, "An Order to Stay Safer at Home."   This order extended the effective dates of Executive Orders 14, 19, 28, and 34 FY 19/20 through May 31, 2020, unless sooner amended.   The Order also announced that starting May 1, 2020, the DECD Commissioner would being implementing a "Restarting Plan" to "identify businesses and activities where current restrictions may be adjusted to safely allow for more economic and personal

activity."  The Order also stated that "consistent with guidance from the United States Centers for Disease Control and Prevention," and with certain exceptions, "individuals must wear cloth face coverings in public settings where other physical distancing measures are difficult to maintain."

b.  On May 7, the Governor announced a partnership with IDEXX Laboratories, Inc. to purchase enough of the company's recently authorized COVID-19 testing kits to more than triple the State's testing capacity.  Use of this testing would facilitate a safer reopening.

c.  On May 8, the Governor announced a plan to reopen certain additional businesses in rural Maine over the course of the following two weeks with added health and safety measures that would follow COVID-19 Prevention Checklists.  Under the plan, retail stores and restaurants would be permitted to open to in-store and some dine-in service, respectively – with enhanced safety precautions – in counties where Maine CDC has not found community transmission.  Those counties are Aroostook, Piscataquis, Washington, Hancock, Somerset, Franklin, Oxford, Kennebec, Waldo, Knox, Lincoln, and Sagadahoc.  In the meantime, the "Stay Safer at Home" Order remained in effect.

d.  On May 13, the Governor extended the state of emergency for another 30 days and on May 14, DECD announced that, effective immediately, Maine lodging providers could begin accepting future reservations for stays with an arrival date on or after June 1 for Maine residents and for non-residents who completed the State's 14-day quarantine requirement imposed by Executive Order 34 FY 19/20.

e.    On May 19, DECD announced that Maine residents may use private campgrounds beginning Memorial Day weekend.  State campgrounds are scheduled to open on June 1.

12.    As noted above, Executive Order 34 FY 19/20 that is the subject of this litigation was issued on April 3.  The origin of the Order started with concerns about increased risk of the spread of COVID-19 expressed by a number of municipalities, particularly 1) beach towns that typically see many day or weekend visitors during the warming weather, 2) tourist attraction towns that see the same, and 3) coastal areas (especially island communities which felt particularly vulnerable) that have many seasonal residents who would expedite their plans to return to Maine in order to escape from parts of the country (for example, Massachusetts and New York), with much higher infection rates.  There were also concerns that work-from-home orders issued by other states would induce even more people to come to Maine and increase the risk of the spread of COVID-19, since they would still be able to maintain their employment while here in a more rural and less populated state.  We also took note of the President's early action to impose an international travel ban, and Canada's interest and actions to close its borders and limit travel between its provinces.

13.    Broader concerns were also expressed about the rapidly approaching tourist season.  I am informed that last year, Maine, with its population of 1.3 million citizens, had approximately 22.1 million non-resident visits last summer, with approximately half of those coming from our regional neighbors and ongoing COVID-19 hotspots in Massachusetts, Connecticut and New York.

14.    Given these several concerns and case-related information available as of April 3, the Governor determined, as advised by Maine CDC, that there was a need to not just continue

addressing the risk of infection in the existing population in Maine, but to limit the potential introduction of new infections. This determination was additionally informed by the following:

a. Although Maine had taken numerous measures to increase physical distancing, additional measures were necessary to slow the spread of the COVID-19 virus and lessen the strain on Maine's health care system;

b. Due to extensive community transmission of COVID-19 in the states of New York, New Jersey and Connecticut, on March 28 the USCDC advised residents of those states to refrain from non-essential domestic travel for 14 days, and a Maine order would be consistent with the nature of this advice;

c. The President of the United States and his Coronavirus Task Force issued an advisory to limit travel between and among certain states, and a Maine order would be consistent with the nature of this advice;

d. Several states in the region began imposing their own quarantine and lodging restrictions in order to prevent the spread of COVID-19 from travel, and a Maine order would help limit Maine's exposure to COVID-19 from additional potential travelers; and

e. A temporary requirement on residents and non-residents alike traveling from outside the State to self-monitor and home quarantine for a period of 14 days, and to restrict the operation of hotels and lodging, including certain campgrounds, would further protect Maine's public health interests.

15. Executive Order 34 applies to person based upon their recent travel, not their residency. It applies equally to residents of other states as well as Maine residents who leave and return

to Maine.  In short, the Order a) requires that travelers arriving in Maine, regardless of their state of residency, self-quarantine for 14 days to mitigate the spread of COVID-19; b) instructs visitors not to travel to Maine if they are displaying symptoms of COVID-19; c) advises visitors not to travel to Maine if they are traveling from cities or regions identified as COVID-19 "hot spots;" and d) to further deter the risk of infection, suspends online reservations for and operations of lodging.  Lodging includes hotels, motels, bed and breakfasts, inns, and short-term rentals such as those available through VRBO, Airbnb, RV parks and campgrounds, and all public and private camping facilities.  The use of lodging is also restricted to health care workers, or other workers deemed necessary to support public health, public safety or critical infrastructure, vulnerable populations, state-arranged quarantine or isolation locations, and state-approved extenuating circumstances.

16.  Executive Order 34 applies a rule of 14 days because Maine CDC advised that this is the incubation period of the virus.  So, if a person is not exhibiting symptoms after 14 days, it is less likely that the person is infected with the COVID-19 virus.

17.  Executive Order 34 does not prohibit persons in specified areas and "hot spots" from coming to Maine.  Rather, it advises against it.  The 14-day quarantine, on the other hand, is a requirement.  The intent of making it a requirement rather than an advisory was to more forcefully reduce the risk posed by travel into Maine, with the intention of monitoring the impact and implementing any "amendment and additional guidance as necessary."

18.  Executive Order 34 does not purport to limit intra-Maine movement because the Stay-at-Home Order (EO 28) provides that protection.  By curtailing the extent to which persons may leave their homes, the Stay-at-Home Order reduces the level of risk from intra-state travel.

19.   Executive Order 34 expressly provides an exception for workers in essential businesses to align with the goals of the Essential Business Order (EO 19) and to accommodate the attraction of more health care workers from outside Maine who could enter and practice in the State, consistent with Executive Order 16 FY 19/20 that eased certain medical license restrictions.  Another example of essential workers are the out-of-state power line workers who were necessary to restore the power from the recent late spring snowstorm.  Quite simply, certain essential services must continue, and requiring persons who provide those services to self-quarantine would interfere with the delivery of those essential services.

20.   We recognize that there will be instances in which the quarantine rule might not be necessary.  For example, a person who accidently drives from Maine into New Hampshire, and then immediately drives back into Maine, almost certainly would not have been exposed to the virus in New Hampshire, and there is thus little reason for him to self-quarantine.  The quarantine was not intended to address the "accidental tourist."  Rather, it was intended to address the risks posed by the millions of individuals entering the state to recreate, travel to seasonal homes, or escape from areas with high infection rates.

21.   Executive Order 34 was not intended, and has not been construed, to require a person coming into Maine to stay for 14 days, only that a person coming into Maine to stay for at least 14 days must spend the first 14 days in quarantine.

22.   Executive Order 34 does not allow persons to self-quarantine in a home state and then travel directly to Maine because of concerns about the reliability of that representation, especially from persons who travelled some distance to reach Maine and had to use restrooms, get food and access lodging along the way.  Further, while to some extent the self-quarantine requirement depends on voluntary compliance, it is easier to verify a

person's claim that he self-quarantined in Maine than to verify a person's claim that he self-quarantined in his home state.  For example, if an out-of-state resident falsely claimed to have self-quarantined in Maine upon arrival, State officials could follow up by, for example, asking the person for the location where he allegedly self-quarantined.  If a person claimed to have self-quarantined at his home in another state, however, it would be all but impossible to verify that claim.

23.   Executive Order 34 has been intended to be enforced by education and community policing, by licensing actions where applicable, and, pursuant to 37-B M.R.S. § 786, by law enforcement as a Class E crime after an individual has failed to comply with a just or reasonable order relative to enforcement of the Order.  I am not aware of enforcement efforts that have been implemented other than education and community policing.

24.   Executive Order 34 was issued pursuant to authorities expressly delegated by 37-B M.R.S. Ch. 13, including but not limited to, the powers to control the ingress and egress of persons and occupancy of premises within the State pursuant to 37-B M.R.S. § 742(1)(C)(8); control the movement of persons and occupancy of premises within the State pursuant to 37-B M.R.S. § 742(1)(C)(8); enlist the aid of any person to assist in the effort to control the emergency and aid in the caring for the safety of persons pursuant to 37-B M.R.S. § 742(1)(C)(5) and 37-B M.R.S. § 827; utilize all available resources of the State as reasonably necessary to cope with the emergency pursuant to 37-B M.R.S. § 742(1)(C)(2); and take whatever action is necessary to mitigate a danger that may exist within the State pursuant to 37-B M.R.S. § 742(l)(C)(l2).

25.   Executive Order 34, as with all of our Orders, remains under review during these rapidly evolving challenges.  All options for adjusted approaches remain under consideration --

especially as the larger potential summer ingress awaits -- as we assess the State's improving testing capacity and the public's apparent level of disciplined and consistent acceptance of physical distancing, use of masks, and the avoidance of crowded areas.

26.     I believe that approximately 30 other states have adopted COVID-19-related quarantine orders.  While the approaches vary, the purposes and goals appear to be the same, with a particular regional concern in the Northeast for the risk from interstate vehicular travel between and among the areas considered hot spots such as New York, Massachusetts, and Connecticut.

27.     Maine is unique, though, because we are at the northern end of the Northeast corridor and, as such, we are a more discretionary and very popular short- and long-term destination. Again, Maine, with its population of 1.3 million citizens, had approximately 22.1 million non-resident visits last summer, with approximately half of those coming from our regional neighbors and ongoing hot spots in Massachusetts, Connecticut, and New York.  The day and overnight tourists triple the size of towns in our densely populated beach areas and in some of our inland lake areas.  With increased population comes increased risk.

28.     In order to continue to slow the spread of COVID-19, the State is focused on expanding testing to determine the rate of infection for the State and increasing contact tracing to stop the spread from identified positives more quickly.

29.     Based on my experience managing this emergency over the last three months, I believe that the fundamental principle of emergency management that underlies 37-B M.R.S., Ch. 13 is to enable a governor to access the elastic tools necessary to mitigate the effects of the emergency and to respond quickly as the situation changes.  It is critical that decisions be

made in close consultation with medical experts and based on the best available medical evidence.

30.    Based on my experience managing this emergency over the last three months, I believe that it is axiomatic that urgently needed, broad-based Orders deemed necessary by a governor upon advice of other State officials and the State's public health experts given rapidly developing, largely unknown  and potentially deadly circumstances will be subject to claims of being both over- and under-inclusive.   That is the nature of emergency management, especially in a fast-moving unprecedented pandemic.  I also believe that it is axiomatic that arguments that such officials could or should have adopted a different approach are themselves often both over- and under-inclusive.

31.    I further believe that the State's interest in adopting a reasonable, temporary measure supported by the best available medical evidence and advice during the middle of an international pandemic in order to protect the public health of people within the State far outweighs an individual's desire to be wholly free of any restraint or recreate seasonally in Maine.

I declare under penalty of perjury that the foregoing is true and correct.

Dated:  May 25, 2020                                    /s/ Derek P. Langhauser
                                                       Derek P. Langhauser

16

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on this, the 25th day of May, 2020, I electronically filed the above

document with the Clerk of Court using the CM/ECF system which will send notification of such

filing to the following:

GENE R. LIBBY
glibby@lokllc.com

KEITH P. RICHARD
krichard@lokllc.com

TYLER J. SMITH
tsmith@lokllc.com

<div style="margin-left:50%">

/s/ Christopher C. Taub
CHRISTOPHER C. TAUB
Deputy Attorney General
Six State House Station
Augusta, Maine  04333-0006
Tel.  (207) 626-8800
Fax (207) 287-3145

</div>