UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MAINE

BAYLEY'S CAMPGROUND, INC, d/b/a
BAYLEY'S CAMPING RESORT, *et al.*,
Plaintiffs,

v.  CIVIL ACTION NO.: 2:20-cv-00176-LEW

JANET MILLS, in her official capacity as the
Governor of the State of Maine,
Defendant.

## STATEMENT OF INTEREST ON BEHALF OF THE UNITED STATES

The United States of America respectfully files this Statement of Interest under 28 U.S.C. § 517, which authorizes the Attorney General "to attend to the interests of the United States in a suit pending in a court of the United States." The United States has a substantial interest in the preservation of its citizens' constitutional rights, including the guarantee that "[t]he Citizens of each State shall be entitled to all Privileges and Immunities of Citizens in the several States." U.S. Const., art. IV, § 2. Especially in the midst of the COVID-19 pandemic, the United States also has a strong interest in ensuring the development and maintenance of the best possible public-health strategies to combat the virus and protect the people of the United States from harm. This case raises issues of national public importance regarding the interplay between the government's compelling interest in protecting the public and citizens' constitutional right to be free from unjustified discrimination on the basis of state residency.

### INTRODUCTION

In the midst of the COVID-19 pandemic, the state and federal governments have a shared interest in promoting the best possible public-health strategies to combat the virus to protect the people of the United States from harm. But that interest does not justify government restrictions

1

that violate the Constitution. Indeed, action that infringes upon constitutional rights is likely to erode public confidence in, and compliance with, legitimate efforts taken to address the COVID-19 pandemic.

Here, Maine likely has transgressed the Constitution's limits by discriminating between Maine residents and out-of-state residents with respect to the ability to patronize campgrounds and RV parks within the State. Residents from outside Maine must self-quarantine for 14 days before they can enjoy these facilities, while Mainers who have not ventured outside the State may frequent them at any time. That is true regardless of whether the Maine resident has recently come in contact with others suffering from COVID-19 or whether the out-of-stater hails from an area relatively unscathed by the pandemic (such as nearby Vermont) or a hotspot (such as New York City). And this self-quarantine requirement has caused real harm for Maine's campground businesses, at a time when Americans most need their States to support efforts to reopen businesses in a manner consistent with public health.

The Constitution does not permit the discriminatory treatment challenged in this case. Although Maine may adopt reasonable measures to protect its residents from the COVID-19 pandemic, it cannot discriminate between Mainers and other U.S. citizens in this context unless that distinction is substantially related to ensuring public safety. Because the discrimination here is insufficiently tailored to that objective, it cannot be enforced under Article IV's Privileges and Immunities Clause.

## BACKGROUND[1]

On April 3, 2020, the Governor of Maine issued Executive Order 34 FY 19/20, which required the closure of all lodging operations within the State, including campgrounds and RV parks. Executive Order 34 FY 19/20 § I.5. The Order also compels "any person, resident or non-resident, traveling into Maine" to "immediately self-quarantine for 14 days." *Id.* § I.1. Anyone who violates the Order may face up to six months in jail and a $1,000 fine. *Id.* § III. The Order contains an exception to the self-quarantine requirement, however, for anyone engaged in "essential services" as specified in Executive Order 19 FY 19/20, *id.* § I.1, which sets forth a lengthy list of occupations ranging from "legal, business, professional, environmental permitting and insurance services" to "fishing and aquaculture" and "forest products," Executive Order 19 FY 19/20 § II.B.2.

On April 29, the Governor issued Executive Order 49 FY 19/20, which incorporates a "Restarting Plan," available online at https://www.maine.gov/covid19/restartingmaine. The Restarting Plan provides that the State's "Campgrounds/RV parks" will be "[o]pen to Maine residents only on May 22" and "[o]pen to out-of-state residents who have completed quarantine guidelines on June 1."

Maine's self-quarantine requirement has contributed to the significant economic harm being suffered by campground businesses that rely on out-of-state patrons each summer for their income. For example, the yearly revenue for Little Ossipee Campground, a small family business in Waterboro, has fallen by over $94,000. PI Mot. 6. Similarly, Bayley's Campground has

---

[1] The United States submits this statement of interest based on the facts alleged in the complaint and the preliminary-injunction briefs and reflected in the accompanying exhibits and publicly available sources.

received over 700 reservation cancellations, refunded over $153,000 in reservation fees, and lost over $260,000 in revenue. *Id.* at 5.

These businesses, along with New Hampshire residents who wish to enjoy Bayley's Campground this summer (and others), brought a constitutional challenge on May 15 against various aspects of the Governor's Orders. According to plaintiffs, requiring only out-of-state residents to self-quarantine before frequenting campgrounds in Maine violates the constitutional right to interstate travel. The same day, plaintiffs moved for an expedited preliminary injunction that would allow, among other things, out-of-state residents to frequent Maine's campgrounds on the same terms as Mainers. The Governor filed an opposition to the motion on May 25.

## ARGUMENT

**Maine's Discrimination Against Out-Of-State Residents With Respect To Campgrounds Likely Violates Article IV's Privileges And Immunities Clause.**

**A.** The Supreme Court has held that the Constitution protects a right to travel from State to State. *See Crandall v. Nevada*, 73 U.S. (6 Wall.) 35, 44 (1868). This right to travel consists of "three different components": (1) an implied right "to enter and to leave" a State, (2) an express right, guaranteed by the Privileges and Immunities Clause of Article IV, "to be treated as a welcome visitor rather than an unfriendly alien when temporarily present in the second State," and (3) an express right, guaranteed by the Privileges or Immunities Clause of the Fourteenth Amendment, to "become a citizen of any State." *Saenz v. Roe*, 526 U.S. 489, 500-03 (1999) (citation and internal quotation marks omitted).

This case involves the second component. The Privileges and Immunities Clause of Article IV guarantees that "[t]he Citizens of each State shall be entitled to all Privileges and Immunities of Citizens in the several States." U.S. Const., art. IV, § 2. As the Supreme Court has explained, this Clause "was designed to insure to a citizen of State A who ventures into State B the same

4

privileges which the citizens of State B enjoy." *Toomer v. Witsell*, 334 U.S. 385, 395 (1948); *see also Saenz*, 526 U.S. at 502 (noting that the Clause provides "protections for nonresidents who enter a State whether to obtain employment, to procure medical services, or even to engage in commercial shrimp fishing" (citations omitted)).

In this case, the Governor's Restarting Plan provides that "Campgrounds/RV parks" are open to all "Maine residents only on May 22" and to those "out-of-state residents who have completed quarantine guidelines on June 1." Restarting Plan, *supra*. Accordingly, a New Hampshire resident who self-quarantines for 14 days within his home in the Granite State, for instance, must undergo an additional quarantine upon arriving in Maine before he can patronize plaintiffs' campgrounds. *See* PI Opp. 13 n.14. By contrast, these campgrounds remain open to any Maine resident, whether or not he has self-quarantined within the last 14 days or ever, so long as he has not recently ventured outside the State. And it is unclear whether even "out-of-state residents" who entered Maine before the Governor issued the self-quarantine requirement and have remained there since (to the extent such individuals exist) must nevertheless "quarantine" to enjoy plaintiffs' campgrounds.

The fact that the Governor's orders *also* burden some Maine residents—namely, those who have recently traveled outside the State—does not render the Privileges and Immunities Clause irrelevant. To the contrary, in addressing California regulations that treated milk differently depending on whether it originated from outside or inside the State, the Supreme Court held that the "absence of an express statement in the [challenged] laws and regulations identifying out-of-state citizenship as a basis for disparate treatment is not a sufficient basis for rejecting" a claim under this Clause. *Hillside Dairy Inc. v. Lyons*, 539 U.S. 59, 67 (2003); *cf. United Bldg. & Const. Trades Council of Camden Cty. & Vicinity v. Mayor & Council of City of Camden*, 465 U.S. 208,

217-18 (1984) (ordinance discriminating on the basis of municipal residency "is not immune from constitutional review at the behest of out-of-state residents merely because some in-state residents are similarly disadvantaged"). As the Court explained, in *Chalker v. Birmingham & Northwestern Railroad Co.*, 249 U.S. 522 (1919), it "held that a Tennessee tax imposed on a citizen and resident of Alabama for engaging in the business of constructing a railroad in Tennessee violated the Privileges and Immunities Clause" even though "[t]he tax did not on its face draw any distinction based on citizenship or residence." *Hillside Dairy*, 539 U.S. at 67. But because the tax "impose[d] a higher rate on persons who had their principal offices out of State," and because "'the chief office of an individual is commonly in the State of which he is a citizen,'" the Court "concluded that the practical effect of the provision was discriminatory." *Id.* (citation omitted); *cf. Healy v. Beer Inst.*, 491 U.S. 324, 336 (1989) (state law may be invalid under the Dormant Commerce Clause in some circumstances based on its "practical effect" alone). Although the Supreme Court reserved the question whether "*Chalker* should be interpreted as merely applying the Clause to classifications that are but proxies for differential treatment against out-of-state residents, or as prohibiting any classification with the practical effect of discriminating against such residents," either of those readings arguably describe the classification here. *Hillside Dairy*, 539 U.S. at 67. For present purposes, a classification on the basis of entry into a State—whether applied to milk or people—appears materially indistinguishable from a classification on the basis of the State where one's chief office is located.

To be sure, the Privileges and Immunities Clause "is not an absolute." *Toomer*, 334 U.S. at 396. It "does not preclude discrimination against nonresidents where (i) there is a substantial reason for the difference in treatment; and (ii) the discrimination practiced against nonresidents bears a substantial relationship to the State's objective." *Supreme Court of New Hampshire v.*

*Piper*, 470 U.S. 274, 284 (1985); *see, e.g.*, *Saenz*, 526 U.S. at 502 ("There may be a substantial reason for requiring the nonresident to pay more than the resident for a hunting license, or to enroll in the state university" (citations omitted)). And in considering whether the discrimination here is sufficiently tailored, the Court should not ignore the context of the COVID-19 pandemic. The Constitution does not hobble States from taking necessary, temporary measures—including quarantines—to meet a genuine emergency. *See Jacobson v. Massachusetts*, 197 U.S. 11, 29 (1905) (observing that "[a]n American citizen arriving at an American port" on a ship that had cases of yellow fever "may yet, in some circumstances, be held in quarantine against his will"); *Compagnie Francaise de Navigation a Vapeur v. Louisiana State Bd. of Health*, 186 U.S. 380, 397 (1902) (upholding Louisiana's quarantine of healthy passengers aboard a vessel during an outbreak of yellow fever against a Fourteenth Amendment challenge).

But even during a pandemic, state actions undertaken in service of the public health cannot be divorced from that end and cannot clearly infringe constitutional rights. Thus, "if a statute purporting to have been enacted to promote the public health, the public moral or the public safety, has no real or substantial relation to those objects, or is, beyond all question, a plain, palpable invasion of rights secured by the fundamental law, it is the duty of the courts to so adjudge, and thereby give effect to the Constitution." *Jacobson*, 197 U.S. at 31. At a minimum, state action cannot be "exercised in particular circumstances and in reference to particular persons" in "an arbitrary, unreasonable manner." *Id.* at 28.

**B.**    At least based on the evidence and argument presented thus far, Maine's discrimination against out-of-state residents does not appear sufficiently tailored to ensuring public safety. Indeed, a federal court recently held that Kentucky travel restrictions issued in the wake of the COVID-19 pandemic requiring both Kentucky and out-of-state residents who traveled into the

7

Commonwealth to self-quarantine for 14 days impermissibly infringed on the right to interstate travel because its restrictions were inadequately "tailored to achieve the government's purpose." *Roberts v. Neace*, --- F. Supp. 3d ---, No. 2:20CV054 (WOB-CJS), 2020 WL 2115358, at *5 (E.D. Ky. May 4, 2020). The same is true here.

Take overinclusivity first. *See Piper*, 470 U.S. at 285 n.19 (holding that a "markedly overinclusive" state residency requirement "does not bear a substantial relationship to the State's objective"). It is unclear why the Governor requires *every* out-of-state resident to self-quarantine for 14 days before patronizing plaintiffs' campgrounds. Had Maine imposed such a burden only on residents from COVID-19 hot spots, such as New York City, this might be a different case. But Maine requires travelers from every corner of the Union to quarantine themselves upon arrival, even if they hail from jurisdictions (such as nearby Vermont) that have *fewer* confirmed cases of COVID-19—either as an absolute matter or per capita—than Maine does. *See* CDC, *Coronavirus Disease 2019 (COVID-19), Cases in the U.S.*, https://www.cdc.gov/coronavirus/2019-ncov/cases-updates/cases-in-us.html (last visited May 28, 2020). In fact, even if non-residents self-quarantine for 14 days within their own States, the Governor will not allow them to patronize campgrounds without self-quarantining for an additional fortnight within Maine. *See* PI Opp. 13 n.14. It is not at all obvious why a 14-day self-quarantine in a New Hampshire home, for instance, is any less effective in reducing the spread of COVID-19 than undergoing the same isolation in a house in Maine. Put simply, the mere fact that a traveler has recently been outside Maine is not a good proxy for the risk that he will spread COVID-19.

Conversely, the Governor permits *every* Maine resident who has stayed within state lines to patronize plaintiffs' campgrounds. It does not matter whether the resident comes from, or has traveled through, one of the four Maine counties where community transmission of COVID-19

8

has been established or the twelve where it has not.  *See* Office of Governor Janet T. Mills, *Governor Mills Introduces Rural Reopening Plan* (May 8, 2020) (discussing locations of community transmission in Maine), https://www.maine.gov/governor/mills/news/governor-mills-introduces-rural-reopening-plan-2020-05-08.  Maine residents who have stayed within the State do not have to self-quarantine for 14 days, certify they have avoided contact with others with COVID-19, undergo temperature screenings, or take any other precautionary measures in order to enjoy plaintiffs' campgrounds.  The "underinclusive" nature of Maine's regime is another strike against it under the Constitution.  *Piper*, 470 U.S. at 285 n.19.

Adding to the underinclusivity is the fact that non-residents may forgo self-quarantining to engage in "essential services" that appear to be equally as risky as camping, if not more so.  As far as public safety goes, it is unclear why out-of-state residents may enter Maine to engage in any "legal, business, professional, environmental permitting and insurance services," for example, but not to patronize a campground or RV park.  Executive Order 19 FY 19/20 § II.B.2.  If Maine wants to prevent the spread of COVID-19, one would think it would start by preventing outsiders from attending a boardroom meeting, not from pitching a tent.

Moreover, Maine could use less restrictive means to advance its interest in protecting public safety.  *See Piper*, 470 U.S. at 284 & n.17 (explaining that when "deciding whether the discrimination bears a close or substantial relationship to the State's objective, the Court has considered the availability of less restrictive means" and that "the State may be required to achieve its legitimate goals without unnecessarily discriminating against nonresidents").  Notably, the individual plaintiffs here could have already self-quarantined for 14 days in their New Hampshire residences before traveling in their campers to their desired campground.  Traveling in their campers from their homes in Meredith and Salem, New Hampshire, to Bayley's Campground in

Scarborough, Maine, *see* Compl. ¶¶ 5-6, these travelers presumably would not have "to use restrooms, get food and access lodging along the way," Opp. 13 n.14. Nor is it clear why "verify[ing]" their claim that they self-quarantined in New Hampshire would be any harder than verifying the claim that they did so upon arriving in Maine. *Id.* It is not as if Maine officials are engaging in a two-week surveillance of any out-of-state resident who self-quarantines upon arrival; indeed, the Governor admits that the "self-quarantine requirement depends on voluntary compliance." *Id.* And there is little reason to think out-of-state residents will be any less compliant or truthful than Mainers. *Cf. Piper*, 470 U.S. at 285-86 (rejecting New Hampshire's suggestion "that a nonresident lawyer will conduct his practice in a dishonest manner").

      In short, while Maine may take reasonable steps to protect public safety during the COVID-19 pandemic, the insufficiently tailored discrimination against out-of-state residents at issue here requires a more compelling justification than the ones the State has offered so far.

## CONCLUSION

The Court should hold that Maine's discrimination against out-of-state residents likely violates Article IV's Privileges and Immunities Clause.[2]

                                                  Respectfully submitted,

                                                  ERIC S. DREIBAND
                                                  Assistant Attorney General

                                                  HALSEY B. FRANK
                                                  United States Attorney

                                                  ALEXANDER V. MAUGERI
                                                  Deputy Assistant Attorney General

                                                  */s/ Alexander V. Maugeri*
                                                  ALEXANDER V. MAUGERI
                                                    Deputy Assistant Attorney General
                                                    Department of Justice
                                                    Civil Rights Division
                                                    Office of the Assistant
                                                      Attorney General
                                                    Ben Franklin Station
                                                    P.O. Box 14403
                                                    Washington, D.C.  20044-4403
                                                    Telephone:  (202) 598-9601
                                                    Facsimile:  (202) 514-8490
                                                    Alexander.Maugeri@usdoj.gov

                                               *Counsel for the United States of America*

---

[2] The United States does not take a position at this time on whether plaintiffs have satisfied the remaining factors necessary for a preliminary injunction.

## CERTIFICATE OF SERVICE

I certify that on May 29, 2020, I electronically filed the foregoing STATEMENT OF INTEREST ON BEHALF OF THE UNITED STATES with the Clerk of the Court for the United States District Court District of Maine by using the appellate CM/ECF system.

I certify that all participants in this case are registered CM/ECF users and that service will be accomplished by the appellate CM/ECF system.

/s/ Alexander V. Maugeri
ALEXANDER V. MAUGERI
  Deputy Assistant Attorney General