UNITED STATES DISTRICT COURT

DISTRICT OF MAINE

| | | |
|---|---|---|
| BAYLEY'S CAMPGROUND INC., | ) | |
| FKT RESORT MANAGEMENT LLC, | ) | |
| FKT BAYLEY LIMITED | ) | |
| PARTNERSHIP, DMJ PARKS LLC, | ) | |
| CURTIS BONNELL, DOLORES | ) | |
| HUMISTON, and JAMES BOISVERT, | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| v. | ) | No. 2:20-cv-00176-LEW |
| | ) | |
| JANET MILLS, | ) | |
| | ) | |
| Defendant. | ) | |

**ORDER ON PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION**

In response to the nationwide spread of Novel Coronavirus 2019, Governor Janet Mills, like many other governors around the country, has issued a series of executive orders designed to slow the rate of infection. One aspect of Governor Mills' executive orders is a warning to people from away that, unless they own or can rent property in Maine where they can quarantine themselves for 14 days, they will find no shelter here. Meanwhile, the Governor has reopened hotels, inns, and campgrounds to Maine traffic, meaning members of the traveling public who – supposedly – have already completed a 14-day quarantine inside Maine.

In this action, a group of in-state businesses and out-of-state individuals[1] who want to provide and/or access Maine lodging and campground facilities, contend the Governor cannot impose restrictions that deprive non-Mainers of their fundamental right to travel and participate in the commerce that currently is available to Mainers.  Given this focus, the action does not threaten to set aside the entire body of executive measures introduced by Governor Mills and her aides, though, if successful, it would kick open the doors to the State's tourist season, unless the Governor modifies her executive orders to restrict lodging and campground activity in ways that do not have the practical effect of discriminating against people from away.

Following a briefing cycle agreed to by the parties,[2] the matter is now before the Court, not on the ultimate merits, but on a motion for preliminary injunction.

## BACKGROUND

For present purposes, the salient facts are as follows.  Beginning on April 3, 2020, Governor Mills imposed an executive order, pursuant to powers vested in her under Title 37-B of the Maine Revised Statutes, Chapter 13, stating that all lodging operations must close as non-essential businesses, subject to certain enumerated exceptions.  Executive Order 34.  The Order also imposed a self-quarantine requirement on all persons entering the State of Maine.  Specifically, as part of the larger mission "[t]o preserve the public health and safety, to ensure the public health and health delivery system are capable of

---

[1] This case also includes a claim by a Maine resident who wants to travel freely out of Maine and back into Maine, without having to self-quarantine for 14 days every time he returns to Maine.

[2] After the parties filed their briefs the United States filed a Statement of Interest under 28 U.S.C. § 517 in support of the Plaintiffs.  ECF No. 19.  I have reviewed the Government's filing as part of my decision in this case.

serving all, and to help protect those at the highest risk and vulnerability," the Order required that "any person, resident or nonresident, traveling into Maine must immediately self-quarantine for 14 days or for the balance of 14 days dating from the day of arrival, except when engaging in essential services."[3]

Violations of Executive Order 34 are punishable as a Class E crime, which carries a penalty of up to six months in jail and a $1,000 fine.  Relevant to businesses that provide lodging and campground facilities, Executive Order 34 "may be enforced by any governmental department or official that regulates, licenses, permits or otherwise authorizes the operations of occupancy of buildings, parks and campgrounds[,]" and a violation of the Order "may be construed to be a violation of any such license, permit or other authorization to which pertinent penalties may be assessed."

On April 29, 2020, Governor Mills issued Executive Order 49, which extended the effective dates of Executive Order 34 through May 31, 2020.  Executive Order 49 also instituted a "Restarting Plan" to govern the easing of COVID-related restrictions. Governor Mills delegated implementation of the plan to the Department of Economic and

---

[3] The Order goes on to dissuade travelers from certain regions from coming to Maine:

> Visitors are instructed not to travel to Maine if they are displaying symptoms of COVID-19, and are advised not to travel to Maine if they are travelling from cities and regions identified as COVID-19 'hot spots,' including, among others, the cities of Detroit, Chicago and New York City.  In addition, residents of the States of New York, New Jersey and Connecticut should refrain from travel to Maine in strict compliance with USCDC travel guidance issued Saturday, March 28, 2020 and any subsequent travel guidance that may be issued during the pendency of this Order."

Executive Order 34 § 1(4).

Community Development, an agency headed by Commissioner Heather Johnson. The Restarting Plan sets out four stages for reopening Maine's economy.

The first stage, extending through May 31, "contemplates a continued . . . 14-day quarantine on people entering Maine[,]" and identifies several businesses that may reopen, so long as they comply with detailed checklists. Lodging operations are not among the businesses that may re-open during Stage 1.

The second stage – described as "June" – "contemplates a continued . . . 14-day quarantine on people entering Maine." Stage two provides that lodging operations and Campgrounds/RV parks may "[o]pen to Maine residents and out-of-state residents who have completed quarantine guidelines." The stage two "checklist" for Campgrounds provides, among other things, "[g]uest visitation restricted to Maine residents and out of state visitors who have met the 14-day quarantine requirement at this time per executive order."

In the third contemplated stage – "July-August" – the 14-day quarantine continues "on people entering Maine." The stage-three list of openings includes, "[l]odging, such as hotels, campgrounds, summer camps, or RV parks for Maine residents and visitors."

Separate and apart from the quarantine provision, on May 8, 2020, the Governor announced a "Rural Reopening Plan" that will apply in Maine's twelve "rural" counties. It orders that "retail stores and restaurants in Aroostook, Piscataquis, Washington, Hancock, Somerset, Franklin, Oxford, Kennebec, Waldo, Knox, Lincoln, and Sagadahoc counties will be permitted to open in-store and dine-in service with enhanced safety precautions," and that remote campsites and sporting camps will also be permitted to

4

reopen "with public health safeguards" in place.  The Rural Reopening Plan does not apply to York, Cumberland, Androscoggin, or Penobscot counties.

*

Bayley's Campground, Inc., d/b/a Bayley's Camping Resort, is a corporation organized under the laws of the State of Maine, with a principal place of business in Scarborough.  FKT Resort Management, LLC is a limited liability company organized under the laws of the State of Maine, with a principal place of business in Scarborough, Maine, and the management entity of Little River Bar & Grille and the Seaside Square Café.  FKT Bayley Limited Partnership is a limited partnership organized under the laws of the State of Maine, with a principal place of business in Scarborough.  DMJ Parks LLC, d/b/a Little Ossipee Campground, is a limited liability company organized under the laws of the State of Maine, with a principal place of business in Waterboro.  The KKT and DMJ entities want the quarantine lifted so they can cater to a traveling public that includes folks from away who would like to migrate through Maine for vacation purposes.

Curtis Bonnell is an individual who resides in Salem, New Hampshire.  Mr. Bonnell and his wife traditionally spend their weekends at Bayley's Camping Resort in Scarborough, "throughout the camping season."  Bonnell Decl. ¶ 4.  He reports that both he and his wife have already contracted and recovered from COVID-19 infection. Presuming to be "low risk," Mr. Bonnell objects to the lack of any "process to be heard or present evidence to establish they should either be exempted or not subject to prosecution." *Id.* ¶ 9.

Dolores Humiston is a school teacher who resides in Meredith, New Hampshire. She has been teaching from home for some time now and since March 26, 2020, she has observed precautions consistent with those imposed on Maine residents by the executive orders. She has "not displayed any symptoms" and, to her knowledge, does not have "the COVID-19 disease." Humiston Decl. ¶ 9. But for the executive orders, she would use her camper every weekend until the school year ends, and then spend the summer at, Bayley's Campground.

James Boisvert is an individual who resides in Scarborough. He also owns a home in Venice, Florida, where he has been staying from May 18 through May 29. Mr. Boisvert also has friends in New Hampshire he likes to visit. He thinks he should be able to pursue some process "to challenge or appeal any enforcement action taken against me if I elect not to quarantine upon my return to Maine." Boisvert Decl. ¶ 11. He states, "I travel observing social distancing and CDC guidance and recommendations." *Id.* ¶ 8.

Together, these entities and individuals (hereafter, "Plaintiffs") challenge the summer-long application of the 14-day quarantine requirement and the Rural Reopening Plan, which they maintain are unlawful restrictions on interstate travel. Compl. Count 1. Plaintiffs also contend the 14-day quarantine is unconstitutional because it deprives all citizens of a fundamental freedom without due process of law, meaning specifically, without regard to the existence of legitimate grounds to conclude that a given person presents an actual risk to public health. Compl. Count 2. Finally, Plaintiffs challenge the Rural Reopening Plan as a violation of due process and equal protection because it

discriminates – arbitrarily they say – in favor of businesses in rural counties.  Compl. Count 3.

*

Governor Mills asks that the traveling public consider the circumstances before passing judgment on the wisdom of the 14-day quarantine and Rural Reopening Plan.  Her opposition to the motion for preliminary injunction relies on the Declaration of Nirav Dinesh Shah, M.D., J.D., Director of the Maine Center for Disease Control and Prevention, and the Declaration of Derek Langhauser, Chief Legal Counsel to the Governor, who, together with Deputy Legal Counsel Linda Pistner, is the "principal author[] of the Governor's emergency executive orders."  Langhauser Decl. ¶ 3.  The following statistics are drawn from the Governor's May 25 submission; they lay out the facts as construed by the Governor and are not reflective of developments since that date.

On January 31, 2020, the United States Department of Health and Human Services determined that as of January 27, 2020, the COVID-19 virus constituted a nationwide public health emergency.  As of May 25, the United States tolled approximately 98,000 deaths from COVID-19, while Maine experienced 2,074 total confirmed cases and 78 deaths.

The COVID-19 virus has an incubation period of up to 14 days and a person can be infected and spread the virus during that entire period without noticing any symptoms.  The possibility of what is known as "asymptomatic transmission" makes control of COVID-19 challenging, because individuals may transmit the disease before knowing they may have it.  Approximately 40% of all COVID-19 transmission can occur while individuals are

asymptomatic and approximately 35% of all COVID-19 patients do not have symptoms at all.

There is currently no vaccine for COVID-19, and it may be at least one year before a vaccine can be developed, and even longer until it will become widely available.  In the absence of a vaccine or widespread treatment, one prevalent method of controlling the virus is to practice "social distancing," also referred to as "physical distancing."  This means keeping appropriate space between oneself and others.  A critical strategy in combatting the COVID-19 virus is to slow its spread by limiting the extent to which persons come in contact with one another.

Fourteen days was selected as the quarantine period because fourteen days is understood to be the average incubation period for the COVID-19 virus.  If a person is not exhibiting any symptoms fourteen days after entering the state, it is unlikely that he or she was infected with the virus at the time of entry.  The quarantine requirement is intended to both reduce the spread of the COVID-19 virus in Maine and reduce and/or prevent an undue strain on Maine's health care system.  The quarantine requirement is intended to reduce the risk posed by a large influx of people entering Maine during the summer vacation season.  Specifically, the quarantine is intended to address the risks posed by the millions of individuals entering the state to recreate, travel to seasonal homes, or escape from areas with high infection rates.

When the quarantine requirement issued, and continuing to this day, nearby states, including Massachusetts and New York, have much higher infection rates than Maine.  In the absence of the quarantine, the capacity of Maine's existing health care system to

provide care for individual patients could be exceeded.  In the summer of 2019, roughly 22 million people traveled to Maine for purposes of temporary recreation.  By contrast, Maine has a year-round population of 1.3 million.  As of May 25, 2020 Maine had 391 critical care hospital beds and 318 conventional ventilators, many of which were occupied treating in-state patients.  Maine has 439 alternative ventilators available.  Alternative ventilators are breathing machines that may have otherwise been used in an operating room and now, because of COVID-19, may be used to provide life-sustaining ventilation to patients in intensive care units.

In her May 25 submission, the Governor made clear that there were not sufficient quantities of test kits to test all of the millions of persons seeking to enter the state (assuming the personnel existed to administer them).  As the supply of test kits increases, and as the State obtains better information about the interpretation of alternative antibody tests, the State assured it will continue to evaluate the use of the tests as a substitute for, or in addition to, the existing quarantine requirement.  There also continues to be significant scientific uncertainty surrounding the notion of "immunity passports"—the idea that individuals who have previously been infected with COVID-19 develop sufficient immunity to prevent them from transmitting the virus.

The Governor recognizes that there will be instances in which the 14-day quarantine rule might not be strictly or ultimately necessary, but stresses that it is impossible to craft a rule that can account for every unique situation that might arise.  The goal was to develop a rule that would account for the vast majority of risk from travel into the state: the influx of risk from spring and summer visitors or other persons coming here from areas with

9

higher infection rates or for recreational and tourism purposes.  By April 29, Maine CDC advised that, as a likely consequence of all of the above measures, Maine appeared to have started to "flatten the curve" (i.e. reduced the rate of new infections).

The 14-day quarantine is a requirement.  The intent of making it a requirement rather than advisory was to more forcefully reduce the risk posed by travel into Maine.  Executive Order 34 does not purport to limit intra-Maine movement because the Stay-at-Home Order (EO 28) separately provides that protection.  Executive Order 34 does not allow persons to self-quarantine in a home state and then travel directly to Maine because of the Governor's concerns about the reliability of that representation, especially from persons who travelled some distance to reach Maine and had to use restrooms, get food and access lodging along the way.

Executive Order 34 is intended to be enforced by education and community policing, by licensing actions where applicable, and, pursuant to 37-B M.R.S. § 786, by law enforcement as a Class E crime after an individual has failed to comply with a just or reasonable order relative to enforcement of the Order.  As of May 25, the Governor was not aware of enforcement efforts other than education and community policing.

## DISCUSSION

Through their Motion for an Expedited Preliminary Injunction, Plaintiffs ask that the Court "enjoin the Quarantine Restrictions."  Mot. at 1.  Specifically, they ask for an order (1) lifting the 14-day quarantine for those entering Maine, (2) lifting the "ban"[4] on

---

[4] The parties dispute whether the Governor's order imposes such a ban at all.  Defendant maintains Executive Order 34 only *suggests* "residents of States of New York, New Jersey, and Connecticut *should refrain* from travel to Maine" (emphasis added), and that this suggestion is not criminally enforceable.

all travel from certain locations in the United States, and (3) lifting the prohibition that prevents "Campground plaintiffs from opening to out-of-state visitors until those visitors have" self-quarantined in Maine.

Injunctive relief is "an extraordinary and drastic remedy that is never awarded as of right." *Voice of the Arab World*, *Inc. v. MDTV Med. News Now*, *Inc.*, 645 F.3d 26, 32 (1st Cir. 2011) (citations and quotation marks omitted). "To grant a preliminary injunction, a district court must find the following four elements satisfied: (1) a likelihood of success on the merits, (2) a likelihood of irreparable harm absent interim relief, (3) a balance of equities in the plaintiff's favor, and (4) service of the public interest." *Arborjet*, *Inc. v. Rainbow Treecare Sci. Advancements*, *Inc.*, 794 F.3d 168, 171 (1st Cir. 2015). As the party seeking injunctive relief, Plaintiffs bear the burden of establishing that the factors weigh in their favor. *Nat'l Org. for Marriage v. Daluz*, 654 F.3d 115, 117, 119-20 (1st Cir. 2011).

"Likelihood of success is the main bearing wall of the four-factor framework." *Ross-Simons of Warwick, Inc. v. Baccarat*, *Inc.*, 102 F.3d 12, 16 (1st Cir. 1996). On this issue "the district court is required only to make an estimation of likelihood of success and 'need not predict the eventual outcome on the merits with absolute assurance.'" *Corp.*

---

Opposition at 6; *see also* Langhauser Decl. ¶ 17. Presumably, this implies that persons from these states able to self-quarantine in private premises in Maine will be tolerated. Plaintiffs nevertheless ask that any such "ban" be lifted as part of the preliminary relief requested in this case.

This is another vexing aspect of the quarantine rule. It purports to criminalize any "violation of this Order," but expresses the Order's requirements using a smorgasbord of verbs: for example, "[v]isitors are *instructed* not to travel to Maine if they are displaying symptoms of COVID-19" (emphasis added). A prospective traveler is left to wonder whether violating the Order's "instruction," or suggestions that they "should refrain from travel to Maine" constitute a "violation." Either the quarantine rule is an executive order enforceable by criminal penalties or it is a sincere suggestion, but it cannot be both. And to signal to an uncertain public that it is officially the former without clarifying what makes a "violation" runs counter to the most basic tenets of due process; to wit, to give fair notice in plain language precisely what conduct constitutes a criminal act.

*Techs., Inc. v. Harnett*, 731 F.3d 6, 10 (1st Cir. 2013) (quoting *Ross–Simons*, 102 F.3d at 16). The moving party's burden to show it is "likely to succeed" varies depending on the relevance of the remaining preliminary injunction factors. If the party seeking injunctive relief fails to make a persuasive showing of likelihood of success, then generally the court acts within its discretion if it denies relief without addressing the remaining factors. *New Comm. Wireless Servs., Inc. v. SprintCom, Inc.*, 287 F.3d 1, 9 (1st Cir. 2002). But the strength of the other three factors can lessen the movant's burden of showing "likelihood of success;" as other circuits to consider the issue have pointed out, "[h]ow strong a claim on the merits is enough depends on the balance of the harms: the more net harm an injunction can prevent, the weaker the plaintiff's claim on the merits can be while still supporting some preliminary relief." *Hoosier Energy Rural Elec. Coop., Inc. v. John Hancock Life Ins. Co.*, 582 F.3d 721, 725 (7th Cir. 2009) (Easterbrook, C.J.).[5] Ultimately, "trial courts have wide discretion in making judgments regarding the appropriateness of such relief." *Francisco Sánchez v. Esso Standard Oil Co.*, 572 F.3d 1, 14 (1st Cir. 2009).

## A.   LIKELIHOOD OF SUCCESS

Plaintiffs' Complaint seeks a declaratory judgment that Governor Mills' Executive Orders imposing the 14-day quarantine and Rural Reopening Plan are unconstitutional, and injunctive relief preventing her from enforcing those orders as written. To assess whether they are likely to succeed on these claims requires putting a finer point on the claims

---

[5] *See also League of Women Voters of the United States v. Newby,* 838 F.3d 1, 6-7 (D.C. Cir. 2016) (applying the "sliding scale approach to weighing the four preliminary injunction factors"); *Reilly v. City of Harrisburg*, 858 F.3d 173, 178 (3d Cir. 2017), as amended (June 26, 2017); *Citigroup Glob. Mkts., Inc. v. VCG Special Opportunities Master Fund, Ltd.*, 598 F.3d 30, 37–38 (2d Cir. 2010).

themselves.  In Count One, Plaintiffs allege the Governor has "deprived citizens of Maine and the citizens of the several States of their fundamental right to travel, as guaranteed by the Maine Constitution[6] and the United States Constitution, in violation of 42 U.S.C. § 1983."[7]  Count Two brings a "procedural due process" claim, alleging the Governor "deprive[d] Plaintiffs of their liberty without due process," specifically, "without any pre- or post-deprivation process."[8]  Count Three—Plaintiffs' challenge to the Rural Reopening Plan—is not related to the relief requested in the motion for preliminary injunction, so I will not consider whether Plaintiffs are likely to succeed on that claim here.

### 1. Plaintiffs Have Not Shown Likelihood of Success on Count One as of This Date

*a. Standard of review*

Citing *Shapiro v. Thompson*, 394 U.S. 618, 634 (1969), Plaintiffs argue that the restriction imposed on their fundamental right to travel is subject to the most demanding level of judicial scrutiny, the aptly named "strict scrutiny" test, because the constitutional right in question is fundamental.  Mot. at 9.  In order to stand, the 14-day quarantine rule must be motivated by a compelling state interest and must also be narrowly tailored to

---

[6] Maine's Constitution does not provide unique protections of an individual's "fundamental right to travel," so I do not consider the state constitution as part of my likelihood of success analysis.  *See Brown v. Dep't of Inland Fisheries & Wildlife*, 577 A.2d 1184, 1186 (Me. 1990) (finding the Maine Constitution does not create a fundamental right to travel).

[7] The parties dispute whether the Campground Plaintiffs have standing to bring this claim.  *Compare* Opposition at 19-20, *with* Reply at 9-10.  Because the resolution of this motion does not rise or fall on that question, I leave it for another day.

[8] Plaintiffs bring due process claims under both the United States and Maine constitutions.  Compl.  ¶¶ 67, 68.  Because "the protections afforded by due process and equal protection under the United States and Maine constitutions are coextensive," *In re D.P.*, 65 A.3d 1216, 1220 (Me. 2013) (citing *Conlogue v. Conlogue*, 890 A.2d 691 (Me. 2006)), I analyze their likelihood of success using the federal standard.

serve the government's interest.  Assuming the pandemic is a compelling justification for restrictions on constitutional liberties, the Plaintiffs argue the 14-day quarantine is not the least restrictive means of achieving that end.  Mot. at 10-14.  In their view, a restriction as drastic as a quarantine must be backed up with individualized findings, like the sort of on-the-spot findings associated with the arrest or seizure of a person based on probable cause, and the kind of process that would be required under the Fourth Amendment to substantiate any prolonged detention.  *Id.* at 14-17.

Citing *Jacobson v. Massachusetts*, 197 U.S. 11, 31 (1905), Governor Mills argues that the "strict scrutiny" test does not apply to this case.[9]  She contends that because her executive orders respond to a serious threat to public health, the quarantine must be upheld unless and until it is determined to have "no real or substantial relation to" preventing the spread of disease or is "beyond all question, a plain, palpable invasion of rights secured by the fundamental law."  Opposition at 2.  If Governor Mills is correct that *Jacobson* applies, the Court must, in turn, apply a legal standard that gives the most extraordinary deference to the State's police powers.  In other words, *Jacobson* represents a legal standard that is at least the opposite of strict judicial scrutiny.[10]  It barely authorizes judicial review at all.

---

[9] The Governor also cites *Campagnie Francaise de Navigation a Vapeur v. Board of Health of the State of Louisiana*, 186 U.S. 380 (1902), in which the Supreme Court upheld a quarantine order that barred entry of healthy persons into a municipality currently under quarantine.  The Court explained that such quarantine orders are not inherently "repugnant to the Constitution."  *Id.* at 387.  Nothing in this Order suggests otherwise.

[10] This Court recently said as much in *Calvary Chapel v. Mills*, when addressing the right to congregate for religious service.  No. 1:20-cv-00156-NT, 2020 U.S. Dist. LEXIS 81962, at *16 (D. Me. May 9, 2020) ("[W]hile such an epidemic is ongoing, the 'traditional tiers of constitutional scrutiny do not apply.'" (quoting *Cassell v. Snyders*, No. 20-CV-50153, 2020 U.S. Dist. LEXIS 77512, at *17 (N.D. Ill. May 3, 2020) (citing *In re Abbott*, 954 F.3d 772, 784 (5th Cir. 2020)))).  It should be noted, however, that other persuasive authorities have disagreed or merely given lip service to the *Jacobson* standard.  *See, e.g., Adams & Boyle, P.C. v. Slatery*, 956 F.3d 913 (6th Cir. 2020); *S. Bay United Pentecostal Church v. Newsom*, No.

When assessing a claim that the fundamental "right to travel" has been infringed by some state action, I look first to the Supreme Court cases providing a legal framework for that claim, rather than to the broadly-stated holding in *Jacobson,* a case rejecting a "substantive due process" challenge to a compulsory vaccination requirement.  Though the Court upheld the state's mandatory vaccination law in *Jacobson,* and noted that states have generous leeway to enact legislation in the face of a public health emergency, it explicitly acknowledged the role of the courts to adjudicate subsequent claims that a state has gone too far.  *Jacobson* 197 U.S. at 28 (recognizing that a state's police power "might go so far beyond what was reasonably required for the safety of the public, as to authorize or compel the courts to interfere for the protection of such persons.").

In the eleven decades since *Jacobson*, the Supreme Court refined its approach for the review of state action that burdens constitutional rights. *See, e.g., Planned Parenthood v. Casey*, 505 U.S. 833, 857 (1992) (noting that "cases since *Roe* [*v. Wade*] accord with [the] view that a State's interest in the protection of life falls short of justifying any plenary override of individual liberty claims.") (citing *Jacobson* as a "see also" authority).  This evolution has likewise refined the scope of the "constitutional right to travel."  Noting the "debate about the appropriate standard of review" in "right to travel" cases, the Supreme Court solidified the framework for this analysis in *Saenz v. Roe,* 526 U.S. 489, 500 (1999). And when the Supreme Court elaborates a new standard for analyzing a constitutional

---

20-55533, 2020 WL 2687079, at *2 (9th Cir. May 22, 2020) (Collins, J, dissenting); *Abbott,* 954 F.3d 772, 796 (Dennis, J, dissenting).

claim, we use that most recent formulation, rather than the framework from a decision for a different constitutional claim, made by a different claimant, in a different state, facing a different public health emergency in a different century.

Plaintiffs also correctly point out that *Jacobson* has been thoughtfully criticized by legal scholars for lacking in limiting principles characteristic of legal standards. Lindsay F. Wiley & Stephen I. Vladeck, Coronavirus, Civil Liberties, and the Courts: The Case Against "Suspending" Judicial Review, 133 HARV. L. REV. F. at p. 4 (forthcoming 2020); *see also* Ilya Somin, *The Case for "Regular" Judicial Review of Coronavirus Emergency Policies*, THE VOLOKH CONSPIRACY (Apr. 15, 2020, 4:16 PM), https://reason.com/2020/04/15/the-case-for-normal-judicial-review-of-coronavirus-emergencypolicies, ("imposing normal judicial review on emergency measures can help reduce the risk that the emergency will be used as a pretext to undermine constitutional rights and weaken constraints on government power even in ways that are not really necessary to address the crisis."). Instead, the permissive *Jacobson* rule floats about in the air as a rubber stamp for all but the most absurd and egregious restrictions on constitutional liberties, free from the inconvenience of meaningful judicial review. This may help explain why the Supreme Court established the traditional tiers of scrutiny in the course of the 100 years since *Jacobson* was decided.[11]   Although *Jacobson* reflects that, when one weighs

---

[11] The Supreme Court has had good cause to do so, including the experience of two World Wars. *See, e.g.*, *Ziglar v. Abbasi*, 137 S. Ct. 1843, 1884 (2017) ("History tells us of far too many instances where the Executive or Legislative Branch took actions during time of war that, on later examination, turned out unnecessarily and unreasonably to have deprived American citizens of basic constitutional rights." (Breyer, J., dissenting)).

competing interests in the balance, the presence of a major public health crises is a very heavy weight indeed and scientific uncertainties about the best response will afford the state some additional leeway to err on the side of caution,[12] it does not provide the standard of review for this case.  Civil libertarians may question whether it ought to provide the standard of review in any case.  But perhaps that depends on whose ox is being gored.

Because Supreme Court jurisprudence on the constitutional right to travel governs the core issue in this case, I look there for the standard of review.  The Supreme Court has defined the right to travel to contain three components, two of which are at issue here: the "right of a citizen of one State to enter and to leave another State," and "the right to be treated as a welcome visitor rather than an unfriendly alien when temporarily present in the second State."  *Saenz*, 526 U.S. at 489.  Curtailment of a United States citizen's right to travel and to enter and abide in the state of his or her choosing requires a compelling justification (i.e., not merely a rational justification).  *Soto-Lopez*, 476 U.S. at 904.

"[F]reedom to travel throughout the United States has long been recognized as a basic right under the Constitution."  *Dunn v. Blumstein*, 405 U.S. 330, 338 (1972) (quoting *United States v. Guest*, 383 U.S. 745, 758 (1966)).  Significantly, "the freedom to travel includes the 'freedom to enter and abide in any State in the Union.'"  *Attorney Gen. of New York v. Soto-Lopez*, 476 U.S. 898, 902 (1986) (quoting *Dunn*, 405 U.S. at 338, and *Oregon v. Mitchell*, supra, 400 U.S. 112, 285 (1970)).  This freedom has roots in our Nation's history and is preserved and protected by several constitutional provisions; among them

---

[12] *See Gonzalez v. Carhart*, 550 U.S. 124, 163 (2007) ("The Court has given state and federal legislatures wide discretion to pass legislation in areas where there is medical and scientific uncertainty.").

the Privileges and Immunities Clause, the Commerce Clause, the Due Process Clause, and the Equal Protection Clause. *Id.* at 902-904; *Jones v. Helms*, 452 U.S. 412, 418-19 (1981). "Whatever its source, a State may neither tax nor penalize a citizen for exercising his right to leave one State and enter another." *Jones v. Helms*, 452 U.S. 412, 419 (1981). A justification that turns exclusively on the fact that the individual is from away is inherently suspect and in derogation of this most basic freedom. If such a classification can ever be sustained, it must be narrowly drawn to meet the interest that is said to compel it. *Cf. Application of Griffiths*, 413 U.S. 717, 721 (1973) ("[C]lassifications based on alienage, like those based on nationality or race, are inherently suspect and subject to close judicial scrutiny." (quoting *Graham v. Richardson*, 403 U.S. 365, 372 (1971)); *Cooper v. Harris*, 137 S. Ct. 1455, 1464 (2017) (race-based classifications impacting the fundamental right to vote must serve a compelling interest and be narrowly tailored to that end).

The rights tied up in the concept of "travel" protect more than itinerancy. They also include a right to enjoy equal access to the fruits of local commerce and governmental beneficence.

> Not unlike the admonition of the Bible that, 'Ye shall have one manner of law, as well for the stranger, as for one of your own country,' Leviticus 24:22 (King James Version), the right of interstate travel must be seen as insuring new residents the same right to vital government benefits and privileges in the States to which they migrate as are enjoyed by other residents.

*Memorial Hosp. v. Maricopa Cnty.*, 415 U.S. 250, 261 (1974) (quoting Leviticus 24:22 (King James Version)). In times of crisis, as in times of peace and tranquility, we are one Nation, and not merely a confederation of states each pursuing its own interest. "The Constitution of the United States is a law for rulers and people, equally in war and in peace,

and covers with the shield of its protection all classes of men, at all times, and under all circumstances." *Ex parte Milligan*, 71 U.S. 2, 107 (1866).

"It has become axiomatic that '[p]recision of regulation must be the touchstone in an area so closely touching our most precious freedoms.'" *United States v. Robel*, 389 U.S. 258, 265 (1967) (citations omitted).  A state might impose a restriction on ascertainable groups by criminalizing knowing or reckless conduct associated with the transmission of COVID-19, such as, for example, a failure to abide by the self-quarantine rule where the individual in question meets high-risk characteristics and the state regulation affords notice of what those characteristics are.  Such restrictions might best satisfy a standard requiring that emergency measures be narrowly drawn and would turn on the sort of factual circumstances that reasonable minds would recognize and appreciate.  But a restriction that is inherently prejudicial to interstate traffic regardless of circumstance can only be condoned in the face of a dire hazard and, even then, tolerated only so long as the hazard is paramount.  Any other approach would not be a narrowly tailored exercise of the police power.

b. *Likelihood of success*

I agree with Plaintiffs that fundamental rights are burdened by the order to quarantine.  However, I am not persuaded, at this date, that the measure is not the least burdensome way to serve a compelling governmental interest, given all that we do now know.  Although I consider it eminently reasonable for Plaintiffs to **earn a living** and move about during a state of emergency, Plaintiffs have not persuaded me that they are, **at present,** "likely" to be able to prove that the quarantine violates their constitutional rights.

But as the Governor points out, "[c]onditions on the ground can change quickly." Mot. at 6.

A prohibition that paints with such broad-brush strokes as to color as criminal every person who enters Maine to lodge or camp, or for most any other purpose, unless they quarantine for 14 days may or may not be judged to be "narrowly tailored" despite its rationale. Restrictions of the kind challenged in this action – i.e., restrictions that indiscriminately impact strangers from away who do not own property in the state – clearly burden fundamental rights. Although the quarantine rule purports a certain neutrality insofar as it imposes a restriction on all who enter the state, including state residents, it effectively discriminates among members of the public in practical application because it grants or denies access to Maine's goods and services based on citizenship status and access to realty, without regard to the presence or absence of circumstances that would justify imposition of such a burden on a person when considered as an individual. Indeed, in case there is any doubt, the Governor has flatly conceded that the quarantine is intended to reduce the risk posed by a large influx of people entering Maine during the summer vacation season.

During the Dust Bowl and Great Depression, the State of California passed a law making it illegal to transport indigent persons across the state border. The Supreme Court struck down the law, relying on the Interstate Commerce Clause, *Edwards v. California*, 314 U.S. 160 (1941), notwithstanding an unrefuted showing that "the huge influx of migrants into California in recent years has resulted in problems of health, morals, and especially finance, the proportions of which are staggering." *Id.* at 167. In words as

applicable today as they were then, the Court observed that the constitutional principles on

which our Nation was founded were antithetical to isolationist policies.

> We have repeatedly and recently affirmed, and we now reaffirm, that we do
> not conceive it our function to pass upon 'the wisdom, need, or
> appropriateness' of the legislative efforts of the States to solve such
> difficulties. *See Olsen v. Nebraska*, 313 U.S. 236, 246.

> But this does not mean that there are no boundaries to the permissible area
> of State legislative activity. There are. And none is more certain than the
> prohibition against attempts on the part of any single State to isolate itself
> from difficulties common to all of them by restraining the transportation of
> persons and property across its borders. It is frequently the case that a State
> might gain a momentary respite from the pressure of events by the simple
> expedient of shutting its gates to the outside world. But, in the words of Mr.
> Justice Cardozo: 'The Constitution was framed under the dominion of a
> political philosophy less parochial in range. It was framed upon the theory
> that the peoples of the several states must sink or swim together, and that in
> the long run prosperity and salvation are in union and not division.' *Baldwin
> v. Seelig*, 294 U.S. 511, 523.

*Edwards v. California*, 314 U.S. 160, 173-74 (1941).

Maine's 14-day quarantine combined with its Restarting Plan, which allows hotels,

motels, and campgrounds to open to out-of-state residents only if they have "completed

quarantine guidelines" within the state, effectively closes the border for many would-be

travelers. If an out-of-state resident wishes to travel to Vacationland this summer, but does

not have their own property from which to comfortably shoulder the burden of 14 days of

quarantine, they are unable to come to the state without violating the Governor's Orders.

The Governor nevertheless argues the "quarantine requirement imposes no barrier or

obstacle to entry to or departure from the State like those the Supreme Court has found

unlawful." Opposition at 16. Indeed. The barrier-to-entry here is unique, and perhaps this

makes it more difficult to overcome. But the Governor's orders say to any out-of-stater

who does not own or rent property on which to self-quarantine that the state's borders are closed for the summer on penalty of fine, imprisonment or both.  Taken together, the Orders significantly hinder both the "right of a citizen of one State to enter and to leave another State," and "the right to be treated as a welcome visitor rather than an unfriendly alien when temporarily present in the second State," two of the three "components" of the right to travel recognized by the Supreme Court.  *Saenz*, 526 U.S. at 489.  I, therefore, find both of these two components of the right to travel are burdened by the Quarantine Restrictions challenged by Plaintiffs.

Though it is clear that Maine's Quarantine Restrictions burden Plaintiffs' "right to travel," they have not shown a likelihood of success sufficient to justify a preliminary injunction.  Plaintiffs argue the regulations sweep too broadly by including those who have already been infected with COVID-19 and those who have self-quarantined in states other than Maine.  Motion at 10-11.  State government representatives have acknowledged that the quarantine is broad by design.  Dr. Shah admits the 14-day quarantine is intended to "err on the side of caution," even if that means implementing a restriction that may not be necessary in all instances.  Shah Decl. ¶¶ 43-44; *see also* Maine DECD Weekly Update (May 27, 2020) at 10:10 (referring to the 14-day quarantine in June as a "blunt instrument" and "not quite as targeted" at the issues the State is trying to solve).  There is no doubt evidence that the state's restriction is not the least restrictive means to furthering its goal.

But at this early stage, without a developed factual record, I find Plaintiffs have not yet shown they are likely to succeed on this claim.  It is not at all clear that there are any less restrictive means for the state to still meet their goal of curbing COVID-19, and

Plaintiffs' proposed alternatives are at least arguably unworkable.  *See* Opposition at 13-14 (noting the "scientific uncertainty" surrounding issues like immunity, communicability, and testing).  These are matters of public policy to be implemented by politicians and to be evaluated by voters, not by unelected judges, at least at this nascent stage.  Because there is evidence pointing in both directions, and the other three preliminary injunction factors do not lessen Plaintiffs' burden to show likelihood of success, I find Plaintiffs have failed to show they are likely to succeed on Count One, their claim that the Governor has violated their fundamental right to travel.

### 2.  Plaintiffs Have Not Shown Likelihood of Success on Count Two as of This Date

Plaintiffs, likewise, fail to show they are likely to succeed on Count Two, their procedural due process claim.  Plaintiffs allege they "have no opportunity to challenge the basis for their quarantine, nor to exercise their rights without threat of criminal penalty." Compl. ¶ 71.  They believe this "deprive[d] Plaintiffs of their liberty without due process," specifically, "without any pre- or post-deprivation process."  *Id.* ¶ 71.  Readers might not be surprised to learn that police power is routinely exercised in this Country without first conducting public or private hearings, and without offending the Constitution.  So too here.

While due process "normally requires notice and opportunity for 'some kind of hearing' prior to a final deprivation of liberty or property…[t]his generalization is a very loose one."  *Herwins v. City of Revere*, 163 F.3d 15, 18 (1st Cir. 1998) (internal citations omitted).  The Supreme Court has explained "summary administrative action may be justified in emergency situations," *Hodel v. Va. Surface Mining & Reclamation Ass'n, Inc.*, 452 U.S. 264, 299-300 (1981), "and the reason is not hard to grasp."  *S. Commons Condo.*

*Ass'n v. Charlie Arment Trucking, Inc.*, 775 F.3d 82, 86 (1st Cir. 2014). "By their nature, emergency situations require an immediate response. And, in consequence of 'the necessity of quick action by the State,' constitutional due process does not require the usual up-front procedural protections in dealing with emergencies." *Id.* (quoting *Parratt v. Taylor*, 451 U.S. 527, 539 (1981), and citing, inter alia, *San Gerónimo Caribe Project, Inc. v. Acevedo–Vilá*, 687 F.3d 465, 488 (1st Cir. 2012) (en banc) (requiring "additional predeprivation safeguards would defeat the very purpose of the emergency statute" when "the very point of [these] emergency procedures is to permit public officials to act promptly where there is an emergency"); *Elsmere Park Club, L.P. v. Town of Elsmere*, 542 F.3d 412, 419–20 (3d Cir.2008) (officials' "far from perfect" response to a health hazard was permissible when "faced with a situation in which a failure to act quickly could have serious health consequences")).

Because the COVID-19 scenario is the kind of scenario for which emergency action would be expected, and because Plaintiffs have not persuasively shown that they are denied access to quick and meaningful post-deprivation review of administrative action, either through this very proceeding or through some other proceeding in state court, I conclude that Plaintiffs' due process arguments are no more likely to succeed than their travel-related arguments. Since they fail to show a likelihood on either of the claims raised in their Motion for an Expedited Preliminary Injunction, I will deny the Motion.

Based on the foregoing considerations, Plaintiffs have raised a very serious matter for judicial resolution and I am persuaded that they might be able to demonstrate a violation of the Constitution sometime during the travel of this case. However, as matters now stand,

given the nature of the COVID-19 pandemic, in particular in regard to the threat posed by a modern-day traveling public inclined to migrate to Maine in numbers as high as 20 million over the course of a couple of months, the dearth of treatment modalities in relation to such a swollen population, and the impracticality of stemming the tide through the individualized assessment of persons *having already arrived*, I am not persuaded that the evidence supports a finding that the Governor has yet exceeded her powers, such as would justify an expedited preliminary injunction.

## B.   IRREPARABLE INJURY

To show they are entitled to preliminary injunctive relief, Plaintiffs must also show they will suffer irreparable injury.   "'Irreparable injury' in the preliminary injunction context means an injury that cannot adequately be compensated for either by a later-issued permanent injunction, after a full adjudication on the merits, or by a later-issued damages remedy."[13]   *Rio Grande Cmty. Health Ctr., Inc. v. Rullan*, 397 F.3d 56, 76 (1st Cir. 2005).

> While certain constitutional violations are more likely to bring about irreparable harm, we have generally reserved this status for "infringements of free speech, association, privacy or other rights as to which temporary deprivation is viewed of such qualitative importance as to be irremediable by any subsequent relief." *Pub. Serv. Co. of New Hampshire v. West Newbury*, 835 F.2d 380, 382 (1st Cir.1987). …
>
> Also, it has long been held that traditional economic damages can be remedied by compensatory awards, and thus do not rise to the level of being irreparable. *Puerto Rico Hosp. Supply, Inc. v. Boston Scientific Corp.*, 426 F.3d 503, 507 (1st Cir. 2005). Yet, it has also been recognized that some economic losses can be deemed irreparable. For instance, "an exception exists where the potential economic loss is so great as to threaten the existence of the movant's business." *Performance Unlimited, Inc. v. Questar*

---

[13] There is no claim for money damages in this action.  The Eleventh Amendment would bar such a claim in any event.

> *Publishers, Inc.*, 52 F.3d 1373, 1382 (6th Cir.1995) (citing *Doran v. Salem Inn, Inc.*, 422 U.S. 922, 932 (1975) (finding no abuse of discretion in determination that "absent preliminary relief [movants] would suffer a substantial loss of business and perhaps even bankruptcy")) ….

*Vaqueria Tres Monjitas, Inc. v. Irizarry*, 587 F.3d 464, 484-85 (1st Cir. 2009).  All of the Plaintiffs have presented more than a straw-man showing in relation to injury.  The right to travel is as deeply seeded in our constitutional soil as the right of assembly and is, apodictically, essential to the observation of a right of assembly.  Moreover, the right to travel is fundamental; leisurely and temporary migrations are no less a component of liberty than the toilsome and cruel migrations of the Dust Bowl.  And while the business-entity Plaintiffs have not yet suggested the quarantine will destroy them, perhaps that showing is only a matter of time.

The irreparable injury element presents very weighty concerns.  However, at present, I do not have a solid basis to conclude that the concern for Plaintiffs' injuries exceeds the concern for public health or would justify a federal judge wading into the breach to dictate the most appropriate response to this pandemic insofar as the traveling public is concerned.

## C.   BALANCE OF EQUITIES

To obtain preliminary injunctive relief, a Plaintiff must also show "a balance of equities in [her] favor."  *Arborjet*, 794 F.3d at 171.  This involves weighing "the balance of relevant hardships as between the parties."  *Vaqueria Tres Monjitas, Inc. v. Irizarry*, 587 F.3d 464, 482 (1st Cir. 2009).  The Governor's executive orders are informed by a desire to preserve public health in the face of a pandemic.  Striking down the quarantine order would seriously undermine her efforts and, *based on the current record*, would effectively

26

disregard the balance of powers established by our federal system. Plaintiffs have not shown their hardships—exclusion from vacation property and loss of revenue— definitively outweigh the purported public health danger of lifting the quarantine restrictions, or the state's burden in fashioning a new response to the COVID-19 challenge.

## D.   PUBLIC INTEREST

"The public interest factor requires this Court to inquire whether there are public interests beyond the private interests of the litigants that would be affected by the issuance or denial of injunctive relief." *Everett J. Prescott*, *Inc. v. Ross*, 383 F. Supp. 2d 180, 193 (D. Me. 2005)). The public interest in this case is enormous, though not monolithic. The type of injunctive relief Plaintiffs seek would upset the bedrock of the state's public health response to COVID-19, an area this Court does not wade into lightly. But Plaintiffs have identified important interests on their side, as well—the lost profits from a lost summer travel season, and the burden on many out-of-staters' ability to travel to Maine. Despite these very real burdens, on balance, the Plaintiffs have not done enough to show the interest in issuing injunctive relief outweighs the public's interest in denial. I, therefore, find this factor tips the scale in favor of the Governor.

## CONCLUSION

Plaintiffs advance a civil rights action that has potential. Their case pits a prudent fear of a possible explosion of infection against a competing ethic best described as the indomitable human desire to enjoy individual liberty and pursue one's life and livelihood notwithstanding the sort of repercussions that keep epidemiologists and practitioners of the precautionary principle awake at night. Where the tipping point lies between these

opposing values cannot be drawn with a bright line, but presumably there comes a time when prudent fears give way to the hopeful spirit that informs our migratory nature and the fair-mindedness that presumptively guides the application of police power.  However, judging the preliminary injunction motion based on the facts on the ground today, Plaintiffs have not demonstrated a likelihood of success on the merits, a favorable balance of the equities, and the absence of a serious countervailing public interest. Furthermore, irreparable injury is, at this time, only suggested, though it is no doubt mounting. Therefore, Plaintiffs' Motion for Expedited Preliminary Injunctive Relief is **DENIED**.

     **SO ORDERED.**

Dated this 29th day of May, 2020.

     /s/ Lance E. Walker
     UNITED STATES DISTRICT JUDGE